*Margin notes:*
ALBANY, Dec. 1823.

M'Donald v. Neilson

Should have been an issue

For affirmance, 19. For reversal, 6.

---

WILLIAM M'DONALD, FRANKLIN LIVINGSTON, WILLIAM GRIFFETH and SETH EDDY, appellants,
*against*
JOHN NEILSON, respondent.

A party charged as combining with others, in a fraud against which relief is sought, and who, therefore, is made a defendant, but against whom no particular relief is prayed, may, though liable for costs, be a witness for his co-defendants.

He comes within the exception to the general rule excluding a witness on account of interest, viz. that where the interest is contingent or uncertain, the witness is nevertheless competent, and the objection shall be confined to his credibility.

Where a party, whose personal property has been seized under an execution against him, and a sale of it forced with great rigor and oppression, and at enormous sacrifice, by the deputy sheriff, acting in concert with

the creditor, who is the chief bidder at the sale, is induced, in order to avoid the sacrifice of the whole property, to yield to the demands of the creditor, and to give him a bond and mortgage for a large sum of money, so as to cover not only the amount of the execution, but also debts due from a son of the debtor who is insolvent, the sale will be declared oppressive and illegal by a court of equity; and the bond and mortgage, as having been oppressively and illegally obtained, will be directed to stand as security for the amount only which is due on the execution, with interest and costs; and, on payment of that amount, to be delivered up and cancelled.

But where, in such case, the creditor has other demands against the debtor, though they could be enforced in a court of equity only, the bond and mortgage shall also stand as security for them.

And if it appear, moreover, that the bond and mortgage were executed upon full and adequate consideration, and are on the whole reasonable, the court will not interfere; especially where the debtor has delayed all objection to the security so long that the creditor cannot be reinstated in his original rights.

A party asking equity must do equity.

A sheriff is not bound to obey the instructions of a party, in executing a *fi. fa.* if he sees it will produce a great sacrifice of property;

But should rather postpone the sale; especially where the plaintiff cannot sustain any injury by the delay.

He should take all necessary and all lawful measures to secure the sum he is directed to levy;

But as to the time, place and manner of sale, he is vested with a sound discretion.

A legal act will always be presumed to have been done for a legal purpose, unless the contrary is made to appear by positive proof, or the strongest circumstantial evidence. Per Sutherland, J.

But when it does appear to have been done for an illegal purpose, a court of equity will restrict its operation to the object which might legally have been accomplished by it. Per Sutherland, J.

*Execution*—The cases which require regularity, and fairness in a sale, under, cited by respondent's counsel.

*Set-off*—Authorities, limiting the right of, to cases of mutual debts, and excluding the right to set off torts and damages upon a special agreement, cited by counsel for the respondent, with those which show the rule to be the same in equity as at law.

To constitute a right of set-off in equity, there must be mutual debts between the same parties, in their own right, of the same kind or quality, and be clearly ascertained or liquidated. Per Woodworth, J.

A court of equity follows the same rule as a court of law, in respect to set-off. Per Woodworth, J.

Every material allegation should be put in issue by the pleadings. Per Woodworth, J.

*Consideration*—The voluntary restoration of that which the law will compel a man to restore, not a sufficient consideration for a contract. Per Sutherland, J.

*Consideration*—Agreement of a son that the father shall deduct a certain part from his portion, is no sufficient consideration. Per Sutherland, J.

*Duty of officers in executing process*—The law will make the most liberal intendment in favor of its ministerial officers, but will not permit them to resort to the *ultima ratio*, when the legitimate objects, which it is their duty to effect, can be accomplished by milder means. Per Sutherland, J.

Sheriff should obey a *fi. fa.* in having money at return day—should not show favor nor give unreasonable delay, nor be guilty of oppression, nor use more severity than is necessary. Per Savage, Ch. J.

Chancery may relieve against deeds or judgments obtained by fraud or imposition; or where, if regularly obtained, there are circumstances of extraordinary hardship, or great inadequacy of consideration; but the party asking equity must do equity; and he must not, on his part, have been guilty of fraud and chicanery. The hardship should not be the consequence of his own misconduct; nor should he delay coming for relief, till the situation of the parties is so far changed that they cannot be reinstated in their original rights. Per Savage, Ch. J.

<div style="text-align: right">ALBANY,<br>Dec. 1823.<br><br>M'Donald<br>v.<br>Neilson.</div>

APPEAL from the Court of Chancery. The respondent filed his bill in the Court below against the appellants. One object of the bill was to set aside a bond and mortgage, for $25,000, executed by the respondent to M'Donald, one of the appellants, upon the ground that these securities had been executed to avoid a forced, oppressive and illegal sale of the respondent's property, which, as he alleged in his bill, had been conducted by M'Donald, in concert with the other appellants under a *fi. fa.* issued against the respondents.

The bill stated, and the answer admitted, that in August term, 1819, the appellants M'Donald & Livingston, obtained a judgment in the Supreme Court, against the respondent for $480 83, upon which a *fi. fa.* issued in November of the same year, under which the appellant, Griffeth, a Deputy Sheriff, by the direction of M'Donald, was proceeding in a sale of the respondent's property, at a great sacrifice, to avoid which, the securities in question were executed. The appellant, M'Donald, set up in his answer the following, among other matters of defence:

That in May, 1818, he recovered a judgment of $1645 33, against John Neilson, jun., a son of the respondent, upon a promissory note made by him, the 14th March, 1816, for $1393 82, payable to one Jacob Boyce, or order, and en-

·dorsed by him for the accommodation of J. Neilson, jun., and received by M'Donald, in part pay for a debt due from J. Neilson, jun., for goods before that time sold by M'Donald to him; that M'Donald sued out a *fi. fa.* under which he and the appellant, Livingston, levied upon the goods and chattels of John Neilson, jun., to the value of about 800 or 1000 dollars, which the respondent claimed as his own, and caused to be replevied; that the replevin suit was tried, in May, 1819. On the trial the respondent claimed the goods by a purchase from D. Newland, who, it appeared, bid them off at a Sheriff's sale, on an execution in favor of Rockwell and Stebbins, against J. Neilson, jun. That this Sheriff's sale was on the 27th January, 1817; that the sales to Newland were of the same articles in question in the replevin suit. The bids amounted to $353 33, which the respondent paid to Newland, who relinquished his bids to the respondent. The respondent also paid the balance of the execution due to R. & S. of $112 38; that most of the articles sold, were suffered to remain in John Neilson, jun.'s possession.

That the appellants M'Donald and Livingston, in their defence of the replevin suit, proved the judgment, execution and levy, in favor of M'Donald, as before stated; and that J. Neilson, jun., had continued to use most part of the property sold at the Sheriff's sale, and purchased by Newland and sold by him to the respondent; that a bureau and trunk, containing a considerable quantity of dry goods, were sold without the contents being exposed at the time of sale; and when the replevy was made, the respondent appeared ignorant of their contents.

That the appellants, M'D. & L., farther proved, that J. Neilson, jun., in 1816, had sent a raft to New York, worth $1000 or $1200, which he had contracted in writing to deliver to M'D., at New York, in part payment of the debt due to him; that the raft had been withheld from him by the respondent, who had received the avails thereof; that an action of trover had been brought by M'D., against one S. Hewitt, under whose care the raft had been sent to New-York, which was tried at the Albany Circuit, in Oct., 1817;

that J. Neilson, jun. was a witness for Hewitt, upon .hat trial; and swore that his father, the respondent, had received the avails of the raft, and was to pay therewith certain debts due from J. Neilson, jun. among which was the debt due to R. & S. on their judgment; that it was also proved, that the value of all the goods seized by the appellant, and Livingston as Deputy, was about $601, being less than the full value, which M'D. was unable to prove; that the value of that part of the goods seized, not named in the pleadings in the replevin suit, was 235 dollars 69 cents, leaving as the value of the goods and chattels, not named in the pleadings, $365 31, for which, together with the interest, making, in the whole, $394 56, as damages, the jury rendered a verdict in favor of the appellants, M'D. & L. against the respondent; the final judgment was rendered in August, 1819, for $480 83, damages and costs: that on the 10th Nov., 1819, M'D. delivered a *fi. fa.* upon this judgment, to Livingston, who, on the 13th Nov. seized the personal property of the respondent, and advertised the same for sale on the 22d Nov.; that the proceedings upon this sale resulted in the bond and mortgage, which the respondent sought by his bill to set aside.

M'D. farther answered, that as a consideration of this bond and mortgage, not only the bids made at the sale were relinquished, but that he assigned to the respondent the judgment against his son, J. Neilson, jun. and transferred to the respondent the note endorsed by J. Boyce, on which the judgment against J. Neilson, jun. had been obtained, and another note against J. Neilson, jun. also endorsed by Boyce for 800 dollars, and discharged the judgment in the replevin suit. He admitted, however, that Boyce was insolvent. He stated that his debt against J. Neilson, jun. was due for goods sold to him by M'D. in the fall of 1815, to the amount of about $2100.

The answer admitted the rigorous proceedings at the sale by M'D. and the Deputy (as they are hereinafter stated in the opinions of the Judges,) and averred that these proceedings were with a view of making advantageous purchases, in the hope of thereby saving a portion of the large

amount justly due M'D. from J. Neilson. jun. M'D. ther:
and still believing, that the respondent had fraudulently com.
bined with his son, J. Neilson, jun. to prevent him from col-
lecting the same ; and that the respondent had, in the pro-
secution of such fraudulent combination, subjected him to
great trouble and expense in law suits ; and conceiving that
the respondent was morally bound to refund to M'D. the
avails of the raft and other property, which he (the respon-
dent) had fraudulently got into his possession, as before set
forth, and which M'D. would, otherwise, have obtained in
part payment of his demand.

A replication was put in, and proofs taken in the Court
below.   The evidence which relates to that part of the an-
swer above set forth, is stated hereafter in the opinion of the
Chief Justice.

The other facts, material to the points raised by the coun-
sel, and determined by the Court, will be found in the report
of this case as decided in the Court below, (6 John. Ch. Rep.
201 ;) and a summary of the same facts is also given by the
Judges, who delivered opinions here.

For the decree, vide 6 John. Ch. Rep. 212, 213.

*B. F. Butler*, for the appellants, contended that the de-
cree was erroneous, and ought to be reversed, for the follow-
ing, among other reasons :

1. The sale of the respondent's personal property, made
by virtue of the execution in favor of the appellants Wil-
liam M'Donald and Franklin Livingston, was legally con-
ducted ; there is no evidence of any fraudulent combination
on the part of the defendants, nor did the Sheriff violate his
duty.

2. If the Sheriff's sale was improperly conducted, and the
bond, mortgage and note, extorted by means thereof, the res-
pondent should have applied to the Supreme Court, out of
which the execution issued, for relief.

3. Even admitting the Sheriff's sale to have been impro-
perly conducted, the bond and mortgage executed by the
respondent to the appellant, William M'Donald, and the
note made by him to the appellant, Seth Eddy, were not
thereby invalidated.

4. The bond and mortgage to William M'Donald, and the note to Seth Eddy, were executed by the respondent voluntarily, with full knowledge of his rights, and upon good consideration, and there is no ground upon which the Court of Chancery could properly interfere, with regard to either of those securities, and especially with the note to Eddy.

5. The respondent having fraudulently combined and colluded with his son, John Neilson, jun., for the purpose of defeating the collection of the just demands of the appellant, William M'Donald, was not entitled, in this case, to the interposition of the extraordinary powers of the Court of Chancery.

6. By his silence and delay, the respondent affirmed the settlement made by the appellants, William M'Donald and Seth Eddy, and cannot now be permitted to impeach the same.

7. If the respondent was entitled to be relieved from the bond and mortgage, he ought not only to have been required to pay the amount of damages, costs, and Sheriff's fees, upon the judgment against him, but he should have been decreed to deliver up and cancel the release of all demands executed by the appellant, William M'Donald, and to account, before a master, for all the property of John Neilson, jun., to which the appellant, William M'Donald, was equitably entitled, and which came to the respondent's hands with notice of such equitable interest.

8. The bill should have been dismissed, with costs, as to all the defendants.

As to the admissibility of Griffeth and Livingston, as witnesses, in addition to the cases cited by the Chancellor, (6 John. Ch. Rep. 204, 5,) I refer to *Fenton* v. *Hughes,*(a) *Dummer* v. *Corporation of Chippenham,*(b) and *Whitworth* v. *Davis.*(c) There is some inconsistency in saying with the Chancellor, that they are competent, but their credibility is shaken because they are defendants. Their liability is contingent. The reason given by the Chancellor, against their credibility, presupposes that any disinterested

(a) 7 Ves. 287    (b) 14 id. 251    (c) 1 Ves. & Bea. 550.

person may be made a party, so as, at least, to affect his credibility. It is time that this question should be settled. As a defendant, without interest, may demur, if he answer and go to a hearing, he should be considered equally indifferent.

1. The Chancellor considers the sale illegal, because it was *oppressive* and *conducted by concert;* and it is complained of as oppressive, because there was a refusal to postpone. The Chancellor cites no authority to show that it was the Sheriff's duty to do this, nor does he attempt to enforce the obligation of M'Donald or the Sheriff, to exercise their discretion in favor of an adjournment, except from the fact of security having been offered. We do not deny that an adjournment of the sale would have been humane and liberal : but the question is one of strict legal right. It was proper for the Sheriff to obey the direction of the party. Was he or the deputy bound to adjourn ? or should the latter have violated his instructions ? The usual practice is for officers to pursue the course marked out by the party for whom the execution is conducted. This course is generally the safest, because it is at the peril of the party; and, as observed by the Chancellor, he is liable for the abuse. No doubt the deputy persued the ordinary course. How are you to regulate the obligation to postpone sales of property ? It must, of necessity, depend upon circumstances, and is not reducible to any general rule. For the sake of certainty, no rule should be established on the subject.

But the Chancellor objects to the demand of specie— that it was sudden, and not heard of till the commencement of the sale. Was this unlawful ? The Chancellor seems to suppose so; and yet no argument is necessary to show that specie may always be exacted at a Sheriff's sale ; and, on being required, the deputy was bound to exact it. True, it was rigorous. It produced the effect (and was calculated to produce it,) of lessening the bids. The motive might have been to produce this very result; but if the act was sanctioned by law, the motive will not render it illegal. In *Bray* v. ———,(d) a tender of bank notes, for rent, was made, but

(d) 1 Mad. Ch. old ed. 30. MSS. in Am. ed. 1817, it is p. 29.

declined through pique, and a istress made; and, though coin was scarce, relief by injunction was denied.

It must be conceded, that the act was legal, *per se ;* yet, no doubt, our motives will be assailed, in defiance of the language of authority. Under the circumstances, we insist that M'Donald was fully justified in his course, not only in point of law, but morality. It compelled the respondent to disgorge his ill-gotten gain by practices against M'Donald's rights. He openly avows his motives in the answer. He appears not in the character of an oppressor, usurer, or colluder; but, actuated by a sense of the wrongs he had received, he comes in vindication of a legal course taken to indemnify himself against the injury done him by the respondent. No man in the community would have done less.

Reliance is placed, by the Chancellor, on the sacrifice of property; but mere inadequacy of price is not sufficient ground for setting aside a sale. This is the rule even in regard to voluntary sales; and it is more emphatically so in relation to forced ones. The sacrifice was not greater, in this case, than is usual in sales upon execution, where the most ample time is allowed. A Sheriff is not authorized to take security. If he does so, it is at the peril of answering for the goods.

2. The defendants deny all combination—all concert and understanding. As to this, we have the separate denial of four defendants. The proof should be most overwhelming to do away an answer thus fortified. If there was combination, the defendants cannot escape the imputation of perjury. The Chancellor relies upon M'Donald's admission, that he required payment in specie with a view of making advantageous purchases, in the hope of thus saving a portion of the amount due from John Neilson, jun. the son of the respondent. But the answer of one defendant is not evidence against another; and if it were, the admission cannot be brought to bear upon the question of combination. It relates merely to M'Donald's own private motives.

It is alleged that the combination was to prevent competition; but M' Donald denies all fraud. He fully explains

the reasons of his conduct. We cheerfully admit that he and he *alone,* is reponsible for every thing done at the sale. But it must rest with him only.

As to the other defendants, the only evidence of combination is, that they surrendered the property purchased ; but Eddy refused to do this, for his own reasons, until the respondent had secured him for the debt due from his son. Eddy denies all combination ; yet, says the Chancellor, " he was there with gold in his pocket ;" and a circumstance, not inconsistent with the most perfect innocence, is made to overturn the solemn denial contained in his answer.

The hardship of the case is not an objection at law, or in equity. If you allow this consideration to prevail, what limits can you prescribe to the rule, which shall save it from the most pernicious consequences ? It must be applied by the arbitrary views of men, and rest upon the mere discretion of different Chancellors ; and no one can advise whether the rights of the party are secured by law.

If the sale was legal, there is no doubt that the bond and mortgage, and the note to Eddy, were valid. The purchasers, as the consideration for these instruments, relinquished a valid title to property worth $1900. To this amount, at any rate, the instruments are good.

But suppose the sale voidable, yet we insist the mortgage should be sustained. We have to regret, that our points upon this head were dismissed by the Chancellor, with a passing remark, and evidently without undergoing any thing like a serious examination. Equity will not interfere and set aside a specialty, an instrument of a very solemn nature in the eye of the law, upon light or doubtful causes. This is a well settled rule, from which a Court of Chancery should never depart. It is not likely that the mortgage would ever have been thought of by M'Donald, had not the respondent proposed it to him. He did not seek this arrangement, probably supposing that the money would be paid on his arrival at the place of sale. His sole object, on finding the respondent unprepared, was to make advantageous purchases. Eddy had the same object in view, in reference to his own interests ; and, whatever may be the complexion of this affair

in relation to M'Donald and Griffeth, it is perfectly unexceptionable so far as Eddy is concerned.  If there was any haste and coercion, it was not on the part of the appellants, but is imputable solely to the respondent's own friends and advisers.    The rights of the appellants grew out of the law, which the respondent was bound to know.  He acted with his eyes legally open ; and no doubt he perfectly understood his rights, for his counsel, Richard M. Livingston, was present, advising, assisting, and witnessing, the very paper which the respondent is now attempting to impeach. Can such a paper be set aside, without the clearest proof that Livingston acted fraudulently and collusively ?   Securities executed even by a prisoner, in close confinement, are holden valid, when done upon the deliberate advice of counsel.

The mortgage was executed upon a full and valuable consideration.   This consideration consisted of five different subjects,    1. The relinquishment of property purchased at the sale.   2. A release of the balance due upon the *replevin* judgment.   3. The assignment of the debt due from the son of the respondent, upon the judgment of $1600, and the note of $800 endorsed by Boyce.   4. A release of all demands against the son.   5. And a release of all demands against the respondent.

Here, then, the transaction was not only lawful in itself, but rested upon the most ample consideration.   This clearly distinguishes the case from those cited by the Chancellor, bottomed upon inadequacy of consideration.   Had the mortgage been voluntary, no question could have arisen. The consideration of releasing and quieting controversies between the parties would have been enough, *per se*, to have sustained the proceeding.

It is founded not only upon the considerations we have mentioned but another is added.   We find it resulting in a family arrangement, by which the respondent is to deduct what he pays for his son, from the share which the latter expected in his father's estate.   The simple discharge of the debt due from the son, was a sufficient consideration ;(e)

(e) Com. Dig. Action on the Case upon Assumpsit, (B. 3.)

and the Court of Chancery would have carried the arrange-
ment into effect, as an advancement to the son, after Neil-
son's death.    Thus the contest is with John Neilson,
jun. the real debtor.    We stand in the light of a fair credi-
tor, having obtained a legal advantage; and, in such a case,
tho' the equity be equal, Chancery will not strip us of our
security, nor scrutinize closely the manner in which it was
obtained.    But the equity is not equal.    It is all on our side.
Our claim is good, as a matter of abstract justice; and, even
if the advantage has been obtained unfairly, equity will not
deprive us of it.($f$)    It is true, the case which we cite from
Vernon, is since provided for by a clause in the English
bankrupt law; but the principle is not impaired, and, with
the case itself, it is retained in our system.    Thus the lips
of this respondent and his son should be closed, though the
rigid rules of law might not have put the matter in the
same shape as that in which the parties have placed it.

At any rate, the respondent should account for the avails
of the raft which was sold by an executory assignment
from the son to M'Donald, but in the recovery of which the
latter was defeated by the respondent, upon the technical
objection that it had not been delivered.    He pocketed the
avails, with the avowed intent of defeating M'Donald in his
attempt to recover the debt of his son.($g$)    A judgment
against the son was purchased in by these avails, a sham
sale upon execution follows, still farther to defraud us of
our debt, and the *replevin* suit is the consequence.    By these
operations another successful fraud was practised upon
us.($h$)

He who comes to ask equity must do equity.    He must
come with clean hands.($i$)    In 2 Cas. in Ch. 15, it is said,
" Iniquity takes away equity," and in the case of *Wardour et*

($f$) *Small* v. *Brackley*, 2 Vern. 602.    *Sir John Fagg's case*, 1 Eq. Cas.
Abr. 354.    *Stapleton* v. *Stapleton*, 1 Atk. 10.    *Pullen* v. *Ready*, 2 id. 591.
*Stephens* v. *Bateman*, 1 Br. Ch. Rep. 25.

($g$) For the facts in relation to this, see the introduction to the opinion of
.1e Ch. Justice, post, and vid. *M'Donald* v. *Hewit*, 15 John. 348, for the
ground taken at law.

($h$) For particulars, see also post, the introduction to the opinion of the
Ch. Justice.

($i$) *Cadman* v. *Horner*, 18 Ves. 'un. 11.

*ux.* v. *Beresford et ux.*(*j*) the defendant had ɛ tered a bundle of papers relating to the plaintiff's demand, which was entirely distinct from that of the defendant; and for this fraud the Court disallowed the whole of the defendant's demand to £2300, though it was fully proved, and though he swore that he had produced all the papers. The same rule prevails at law.(*k*) So, misrepresentation disqualifies a person to ask for relief.(*l*) This is the uniform language of the books, from the earliest history of the Court of Chancery to this day. We ask its application to the present case, if the Court are satisfied that here has been iniquity on the part of Neilson.

Again: where both parties are equally guilty, the case of the defendant is to be preferred. He is in possession. At most, we have stretched the law in order to avoid the effect of a gross imposition upon us. Our offence is no more than the having opposed force to the devices and machinations of fraud. Force, in itself, cannot be successfully vindicated upon any ground; but where it has resulted in justice, that justice which is administered by a Court of Equity, should leave the parties where it finds them—to their legal rights. There may be extreme cases, like that of Hercules and Cacus, the former of whom was celebrated by the bard of Mantua, for having relieved mankind from depredation and robbery, by the forcible destruction of the latter.

We call for the application of those rules of a Court of Equity, with which the books abound, giving assurances of protection to the holder of legal rights, though they may not have been obtained with perfect fairness, till the antagonist from whom they have been wrested shall do equity on his part. There never was a case in which they could more properly be applied. We call upon this Court to pronounce whether these maxims are to encumber our books, as a dead letter, or be applied to their legitimate purposes—whether they are merely

> "To keep the word of promise to the ear,
> But break it to the hope."

Again: the respondent was perfectly silent, and delayed his application for redress till his son was discharged under

---

ALBANY,
Dec. 1823

M'Donald
v.
Neilson.

(*j*) 1 Vern 452.
(*k*) Vin. Ab. Fraud, (A. a.) 1. *Goodale* v. *Wiatt*, Goldsb. 179, per Popham, J.
(*l*) *Cadman* v. *Horner*, 18 Ves. 11.

the insolvent act, thereby producing a material change in our rights. The objection of delay is sufficient. No positive act of dereliction is necessary to defeat the claim. We can never be reinstated in our rights, in consequence of the delay and insolvency; and the Chancellor ought not to have interfered to set aside the mortgage, without being able to place the parties where they stood orginally.(m) The 1 Madd. Ch. 215, lays down this rule, and illustrates it by a case arising upon marriage articles.

(m) 1 Madd.
Ch. 215, old
ed.

We also have a right to complain, that the respondent was not compelled to deliver up the release of all demands which M'Donald executed. We were not only bound, by the decree, to give up the bond and mortgage, but the release was suffered to remain; and we are thus deprived of all our original rights. Should we pursue the respondent, at law or in equity, the release may be set up as a defence. So as to the son. He, too, was discharged by the release. Nor do I see how the latter release can be avoided by this proceeding. The son is not a party, and cannot be affected by the decree.

Another objection is, that the respondent was not required to account for the property of which we were defrauded by his management in relation to the raft, and the *replevin* suit. We had a claim for this, which was discharged by the arrangement. This is rejected by the Chancellor, upon the ground that it could not legally be *set off*; and he tells us that, "in the case of spoliation, under the Roman law, no compensation was allowed to be opposed against a demand for restitution, according to the maxim of the civil, and which is that of the common law; *spoliatus ante omnia restituendus*, (Pothier Trait. des ob. s. 589; 2 Inst. 714.)" He does not quote Pothier with the proper limitation. That author applies the maxim to cases of criminal plunder, and Lord Coke, in 2 Inst. applies it in the same way. It is there made to bear upon a case of robbery. But the maxim has no force in a Court of Equity. There he who comes for equity must do equity. As the Chancellor applies the maxim, he has violated it himself, in this very decree; for he allows us to retain our mortgage as to the *replevin* judgment.

The only difference between us is in the extent of the allowance. He confines it to the judgment. We wish it to embrace the balance of goods in the *replevin* suit, together with the avails of the raft. We go upon the maxim, that he who seeks equity must do equity ; a rule which applies even where the complainant comes into a Court of Chancery to avoid a legal advantage fraudulently obtained.(*n*)   Take the cases of usury. Though it be illegal to exact a mortgage, covenant, or promise, for its payment, yet the Chancellor never suffers the party to avoid the security, on a bill filed, till he has paid what is justly due, a case strongly analagous to the present. I also refer the Court to *Bates* v. *Graves*, (2 Ves. Jun. 294, 5 ;) and *Ld. Cranstown* v. *Johnston*, (5 Ves. Jun. 277.) The latter is a very strong case of surprise and severity, in a legal proceeding, by which a large estate of the complainant was divested, being sold to satisfy a debt of small comparative value ; yet the sale was considered a security, and extended to protect whatever was justly due to the defendant.   (3 Ves. Jun. 170, S. C.)

(*n*) *Payne* v *Dudley,* 1 Wash. Rep. 196 and 199.

*Van Vechten & Henry,* contra, contended that the decree should be affirmed—

1. Because the mortgage and bond to the appellant, William M'Donald, and the promissory note to the appellant, Seth Eddy, set forth in the pleadings, were extorted from the respondent, by a fraudulent, oppressive, and illegal sale of his personal property, under color of legal process.

2. Because the appellants concluded and combined together, in a fraudulent manner, at the sale, to effect such extortion.

3. Because the whole of the appellants' proceedings at the sale manifest a fraudulent and collusive determination to coerce the respondent, by a wanton sacrifice of all his personal property, to give the mortgage, bond and promissory note, in order to avert such sacrifice.

4. That Franklin Livingston and William Griffeth are incompetent witnesses, and that their depositions should have been suppressed.

ALBANY,     ·The statement of the appellants' case, by their own coun
Dec. 1823.  sel, shows, a most.unwarrantable use of a legal execution,
M'Donald    to enforce a claim foreign to the object of it.  By an undue
   v.       influence over the officer, M'Donald buys about 2000 dollars
Neilson.    worth of property for about $300, under pretence of secur-
            ing a debt with which the respondent had nothing to do.
            Is it honest to use an execution for such a purpose?  We
            are proud to be ·strangers to such honesty.  If the appel-
            lants have gone beyond the law, where is the propriety of
            quieting them in the possession of what they have thus ac-
            quired?  This should have been thought of when " *clean
            hands*" are talked about.  No doubt the motive was, as is
            virtually admitted, *the want of any other remedy.* Neilson's
            sin was, that he was a wealthy farmer, his insolvent son
            owing M'Donald, who could not recover his debt except
            from the father.

            The respondent was absent; the Deputy could have felt
            no alarm, and yet he advertises immediately. · Why was
            this done?  He was not pressed by the return of the exe-
            cution; for the return day was not till the next January
            term.  But it is said he had a *right* to do so.  We .com-
            plain that he did not act with a view to do *right*, but *wrong*,
            in favoring M'Donald's illegal views.  It is admitted that
            a contrary course would have been liberal and humane.  If
            so, it was his duty to follow it.  He does not pretend to
            have apprehended any danger : he asks no receipt, leaves the
            property upon the respondent's premises, who, as appears on
            all hands, was a wealthy farmer, with a large real estate up-
            on which the judgment was a lien.  Yet the personal pro-
            perty is seised, advertised, and set up for sale in the course
            of nine days.

            We are told that the Deputy did his duty in pursuing
            M'Donald's directions.  This we deny.  He was the officer of
            the Court. · All his execution required was, that he should
            have the money forthcoming at the return.  But he does
(o) His evi- not put his conduct on the ground of duty.  He explained
dence is stated his object to Hunter, the witness.(o)  It was to prosecute
6 John. Ch. the sale with rapidity, and  complete it before the respon
Rep. 207.
(p) Vid. id. dent's return.  His explanation(p) of the conversation with
207, 8..

Hunter is not satisfactory, and does not take from the force of his evidence. Indeed, there is no doubt of his purpose. Yet his conduct is called legal. Was it his duty to do more than collect the money? If not, when he did more, he was acting illegally. It was a prostitution of his office, and he became an oppressor. He resisted all delay even for a few hours, within which the respondent might have procured the money. Was this good faith? The property was set up at the hour of sale, and then comes the demand of specie. Did M'Donald want this? No. He wanted *specie in property*, to sell and re-imburse himself for the losses he had sustained by the son of the respondent. His avowed purpose was to put the money out of the respondent's power, with a view to this object. With these motives, he issues corresponding orders to the Deputy, a willing officer, who obeys them. Was not this in derogation of every rule of right? The courts of justice were open for redress against the respondent. Why not resort to them? Because there was no claim which could be enforced there. Here was concert between M'Donald and the Deputy, at least, for the same object. The excuse that the latter was accountable for delay is merely colorable. The circumstances speak a language which cannot be done away by such a pretence. The whole transaction carries management and concert upon its face. The demand of specie was most rigidly enforced, and the acceptance of the bond and mortgage show the view with which this affair was conducted.

Admitting the right to demand specie, was it fair to do this under the circumstances, and under the usual advertisement? The party and bidders had a right to presume it would be, as usual, for current bills. Suppose current bills had been tendered, would not refusal have been a surprise, against which relief should be granted? Was it not the duty of the Deputy to have refused proceeding, and given time on account of the surprise? A man must exercise even a legal right, so as not to produce surprise. Here was a virtual suppression of truth. The intention to demand specie (a thing very unusual) was not made known till the moment of sale, and if the officer was ignorant before, he

knew enough after the great sacrifice produced by this de-
mand on the sale to Walker,(q) to warn him of his duty.
It is not unusual for Courts of Equity to relieve against fraud
and surprise like this. Every security arising from such a
proceeding, is void.

(q) Vid. id.
208.

But it is said here is no evidence of fraudulent combina-
tion. There is certainly something much like combination
between M'Donald and the Deputy. The former com-
mands, and the latter executes. M'Donald declared that
"he must be a Turk that day;"(r) and he fulfilled the office
of a Turk in command. The officer was the Janissary who
did execution, and the respondent was the victim. F. Liv-
ingston had no interest in the execution. He was a party
*pro formâ;* yet he bid for M'Donald, bought in with great
sacrifice, and gave up his purchases on the settlement.(s)
He knew all that transpired. In what other light then, does
he stand than as a coadjutor? His becoming a volunteer in
the fraud does not exempt him, but aggravates his guilt.
Every case of fraud must be drawn from a chain of facts
and circumstances. You can rarely obtain a direct avowal;
but when parties act in concert to effect a fraudulent object,
the law imputes combination.

(r) Vid. id.
209.

(s) Vid. id.
210.

As to Eddy, if he is not implicated, this does not affect
the bond and mortgage. But he went to the auction with
the same views as M'Donald. He sets forth his views in
the answer. It was to make advantageous purchases,(t)
founded, not on the respondent's poverty, but on *specie.*
How should he know of the specie demand, unless he had
been secretly informed of it? He goes prepared with gold
in his pocket—he does not deny that he understood or had
heard it hinted that specie would be required, and he too join-
ed in surrendering the purchase.(u) He heard and knew
what was going forward, and participated in it.

(t) Vid. id.
206.

(u) Vid. id.
210.

But it is said, that notwithstanding the surprise, the sac-
rifices made, and advantages gained, and though the sale
might have been unusual and oppressive on the part of M'-
Donald; yet that his admissions and avowals in the answer,
showing his own object, are not evidence against, nor can
they be made to reach his co-appellants. This is conceded,

so far as his answer alone is concerned, if it could be dis-connected with what was notorious at the sale.

The demand of specie effectually prevented all competition at the sale, and it is well settled, that where a party takes measures to effect such a purpose, this renders the sale void. The law is jealous of sales on execution, and exacts the utmost fairness and integrity from the officers and parties who conduct them.(v)

M'Donald
v.
Neilson.

The denials do not meet the substance of the charge. They do not deny that the object was a sacrifice of property equivalent to the debt of the son. The bond and mortgage accomplished this object. The same exertions and course of things existed as if there had been an express agreement and co-operation. No matter, then, that here are four denials, for which accumulative strength is claimed; but if they were unequivocal, such an effect is not due to them. As one answer is not evidence against the other, so it is not evidence for the other. Each stands by itself. The body of evidence which we present, contradicting ᴏ̄e, equally contradicts all. Besides, being parties charged with fraud, are not the appellants subject to the imputation of wanting credibility, like a witness before a jury in ordinary cases? All the prominent facts are admitted as having taken place in their presence. At least, they are not denied, nor are they falsified by any of the evidence.

(v) *Troup* v *Sherwood,* 4 John. Ch. Rep 228, 254. *Jones* v. *Caswell,* 3 John. Cas. 29. *Hewson* v. *Deygert,* 8 John. Rep. 333. *Jackson* v. *Newton,* 8 John. 362, *per Cur. Tiernan* v. *Wilson,* 6 John. Ch. Rep. 414. *Wooddye* v. *Baily,* Noy, 59. *Executors of Stead* v. *Course,* 4 Cranch, 4ᴏ3.

If, then, the sale was illegal, it indubitably follows, that the bond and mortgage are void. By the terror and tyranny of the sale, the Chancellor means its unusual nature and oppressive effect, leaving the respondent without reasonable time to avoid it according to his real ability, by the abuse and perversion of legal process. The sale was still going forward when proposals of settlement were made; his house was about to be ransacked, and farther sacrifices made. Shall we be told that this terror from the sacrifice of property will not avoid a contract? That this is not the legal definition of duress? A Court of Equity will avoid contracts for fraud or oppression of any kind.

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

Was there an adequate consideration? The respondent received nothing from Eddy. He relinquished his purchase, it is true, but this was nothing, being illegal and void. The debt of the son cannot be taken into the account, for the father was not answerable. If he was, why resort to violence? Why not go into Court? But as to M'Donald, it is said he gave up a note against the son, endorsed by Boyce, with a judgment against the respondent. This judgment is protected by the Chancellor. It is to be paid; and as to the note, both maker and endorser were insolvent. If they had not been so, M'Donald would have been under no necessity of taking this course.

It is said the mortgage, &c, were given by advice of counsel and friends; but why was this advice given? In consequence of the very oppression and fraud complained of. Such an act is not voluntary. Where is the least volition in the case? It is like that of the traveller under the hand of the robber, who is required to " give, or receive the contents." Party, counsel, friends, and family are all equally alarmed. Indeed, any thing like volition is hardly pretended in the answer. Suppose the respondent had defrauded M'Donald? This is not to shut the doors of justice against him. Even a murderer must be tried and executed according to law.

(w) In 6 John. Ch. Rep. 210, 11. He cites *Proof* v. *Hines*, Cas. Temp. Talb. 111. *Gould* v. *Okeden*, 3 Br. P. C. 560. *Kenrick* v. *Hudson*, 6 id. 614. *Thornhill* v. *Evans*, 2 Atk. 330, and *Nicholls* v. *Nicholls*, 1 Atk. 409.

(x) Poth. Trait. des ob. s 589. '2 Inst. 714. 1 Mad. Ch. 214.

What, then, is the law? Not of Hercules and the robber, but of civilized society? Without going into this subject particularly, it is sufficient to refer to the cases cited by the Chancellor,(w) and particularly to those from Atkyns, decided by Ld. Hardwicke, whence it is plain that a contract should be set aside for any kind of fraud or oppression. In the case last cited from Atkyns, the fraud was practiced under color of legal process; yet though legal and regular, the Court of Chancery considered it a species of duress.

It is conceded, that the security should stand for the valid claim alone. As to the other claims set up, the maxim, *spoliatus ante omnia restituendus*, cited by the Chancellor,(x) applies. That what is illegally, violently or fraud-

ulently obtained, should be absolutely and unconditionally restored, is a rule not only of the civil and moral, but also of the levitical law.

It may be said, that violence to personal property is not that kind of duress which shall avoid solemn instruments; but technical duress to the person is not necessary as a foundation for relief in Equity.(y) In *Fell* v. *Riley*,(z) the the Court declared, that "fraud and imposition are exceptions to all rules whatsoever." Equity will relieve against securities obtained in violation of morality.

But we are told that the respondent is not to be relieved because he was forced to make his will before he gave the security; and much has been said about a family agreement. This was produced by the same violent, oppressive cause, and the same sacrifice; that this was an agreement which equity will enforce, is begging the question. Violence lies at its root; and though no injustice may have been done to the rest of the family, was there none in compelling the respondent to this premature arrangement? But the injustice is not, of necessity, confined to the respondent. It may extend to the other members of the family, from changes by death, or the losses and ultimate insolvency of the father.

It is said, that the respondent has committed frauds on M'Donald. Be it so. But has he committed any fraud in this transaction, or any way connected with it? Suppose one passes a counterfeit bill, and after the remedy is barred, the injured person retorts by passing back another in return, will the circumstances of the previous fraud protect him from the state's prison? If M'Donald has been defrauded, let him go into a Court of Equity. The very defence involves an admission that he has stretched the law. The statute allows a set off of debts, but it has extended no farther. To receive other claims as a set off, would be to make every man his own avenger. You can never allow this, then, by the way of set off, unless you assume legislative power, and extena the law to a case from which it has plainy been withholden by the legislature.

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(y) Bac Abr. Duress, (A.) *Attorney General* v. *Sothon*, 2 Vern. 497, per Cur. *Woodman* v. *Skute*, Prec. Ch. 266. Jac. L. D Duress. 2 Danv. Abr. 686. *Reigal* v. *Wood*, 1 John Ch. Rep. 406, per Kent, Ch. *Barnesly* v *Powell*, 1 Ves. 120, 284, 289 (z) Cowp. 281.

ALBANY,
Dec. 1823.

M'Donald
v
Neilson.

But here is no fraud on the part of the respondent, (the counsel examined the evidence upon this point,) or if otherwise, the account on this subject was long since closed by the various law suits between the parties; or being long antecedent to the bond and mortgage, it comes back to the question of set off.

The set off is not in issue by the pleadings, and nothing is better settled than that, in Chancery as well as at law, the recovery or defence must be *secundum allegata et probata*.(a)  This, alone, would be a fatal objection to the defence, if technical ground were necessary.  But the objections resting upon general principles are equally strong.  Aside from the principle, which the Chancellor has established upon authority not to be shaken, that what is obtained by fraud must be absolutely restored, the rules in relation to set off are equally plain against the admissibility of the cross claims insisted on by M'Donald.  What are these rules?

At common law, there was no set off.  It should be borne in mind that this is a proceeding to redress a tort.  The nature of the respondent's claim, and those attempted to be introduced against it, equally forbid the set off.  To warrant a set off says Montague,(b)  " There must be mutual *debts*."  " A set off cannot be pleaded to an action upon a tort."(c)  Nor to damages due upon a special agreement.(d)  In *Howlet et al.* v. *Strickland*,(e) which was covenant, and an attempt to set off damages for breaches in the same covenant, Ld. Mansfield said, " I take this plea to be merely for the purpose of delay.  The act of parliament, and the reason of the thing, relate to mutual debts only.  These damages are no debts.  An *indebitatus assumpsit* could not be brought for them."  The same point was determined accordingly, in *Weigall* v. *Waters*,(f) and *Livingston* v. *Livingston*, in equity.(g)  Indeed the rule is the same both at law and in equity.(h)  Evans in his commentary on Pothier,(i) says that, " by the common law of England, if the plaintiff was indebted to the defendant in as much or more than the defendant was indebted to him, it was no defence."  He places the right of set off upon the stat. 2 and 8 Geo. 2, enacted here; and, as appears by several of the author-

(a) *James* v. *M'Kernon*, 6 John. Rep. 543.

(b) Mont. on Set off, 17.
(c) id. 18. *Keeler* v. *Adams*, 3 Caines' Rep. 84.
(d) Mont. on Set off, 19. *Gordon* v. *Bowne*, 2 John. Rep. 150, 155, 6. *Colson* v. *Welsh*, 1 Esp. Rep. 378.
(e) Cowper, 56.
(f) 6 T. R. 488.
(g) 4 John. Ch. Rep. 287.
(h) *Duncan* v. *Lyon*, 3 John. Ch. Rep. 351, 358, 9, 360, and the cases cited at the pages last quoted.
(i) 2 Ev. Poth. 112.

ities which we have cited, the construction upon ours, and the English statutes has always been the same. It is from Pothier's head of set off or *compensation*, as it is called in the civil law, that the Chancellor has taken the maxim complained ot as inapplicable. Pothier,(*j*) introduces it by saying, that, "in the case of spoliation, no compensation can be opposed against the demand for the restitution of the things of which any person has been plundered, according to the well known maxim, *spoliatus ante omnia restituendus*. V. *Sebast. de Medicis Tract. de Compens.* P. 2, s. 28." Let it not be said that the claim here comes in any other character than that of a set off. M'Donald claims to hold a mortgage on account of a debt which the respondent had assumed.

The decree, then, equitably places the parties where they were, and throws them back upon their legal and equitable rights, as they stood before the sale. M'Donald is deprived of nothing but what he obtained illegally. Here is no pretence, therefore, for applying the maxim, that equity will not take away a legal right, because there is none. As to the rights of third persons, it may be true that a legal advantage will not be rigidly scrutinized, though perhaps obtained in rather a questionable manner. But, in general, wherever one means to protect himself by a legal advantage, it must have been obtained fairly. And so are all the authorities, if we except Fagg's case. This case is no where reported. It is cited by the Chancellor from recollection, in *Huntington* v. *Greenville*,(1) and again in *Hitchcock* v. *Sedgwick*,(*k*) where it is again stated from recollection, but materially different in point of fact. It is then repeated from Vernon, in the 1 Eq. Cas. Abr. 354. It was but slightly adverted to in both instances, and as the case is stated in the 2 Vernon, had the legal advantage there supposed been enjoyed, it would have been a reproach to the administration of justice.

The objection, that we should come with clean hands, proceeds with an ill grace from a man whose hands are stained with fraud, and one who has driven us here for relief. The maxim relied upon, that when both parties are equally guilty, the Court will not interfere between them,

---

*Margin notes:*

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(*j*) 1 id. 416

(1) 1 Vern. 52, 3.
(*k*) 2 Vern 159.

but leave them to hold what they have acquired, might just as well have been applied to our side, to show that, having been successful in the Court below, this court should leave us in possession of the decree which we have obtained.

The delay is no objection. Nothing short of the statute of limitations can come in this shape, and it is enough that there has been no act confirmatory of the sale or securities. The insolvency and assignment of the property of J. Neilson, jun., does not vary the case. The assignment to the father was in trust, for all the creditors, of whom M'Donald is one; and the inventory and discharge did not take place till after the bill was filed.

The releases are a part of the assignment, and the bond and mortgage are the consideration of both. The latter being done away, both the release and assignment cease to operate.

Lastly, Griffeth & Eddy are not competent witnesses. They are charged as coadjutors, and are liable for costs. This is called a contingent interest. The same rule would make every defendant a witness. His interest is contingent, in the same sense ; for it is not known till judgment. The true rule is, that where the evidence puts them on their defence, they are incompetent. Their testimony then becomes necessary, in exculpation of themselves. Besides, F. Livingston was a party to the execution. He had, in this point of view, an interest independent of being a *particeps fraudis.* The case of *Teirnan* v. *Wilson,*(*l*) and *Wooddye* v. *Baily,*(*m*) show that we might have made Griffeth, the deputy, a party, even in law. This consideration, alone, should exclude him.

(*l*) 6 John.
Ch. Rep. 411.
(*m*) Noy. 59.

*T. J. Oakley,* in reply. It is not denied, that in the abstract, here has been a severe and harsh exercise of legal rights. But if it be true, as set up in the answer, that there had been a concert on the part of the respondent and his son, with intent to defraud M'Donald, which had been carried into effect, the case then presents no violation of morality, in his attempting to avail himself of a legal advantage to redress the injury.

Before we examine the case, we ought to determine what witnesses are to be heard. Are Griffeth and Livingston competent? It is said not, because they are charged with fraudulent combination. But, in this way, all witnesses may be disqualified by a complainant. The allegation in the bill is not enough to produce such an effect. No decree is prayed against them; and they have no control over the bond and mortgage, the subject matter of the suit. Their interest, then, must depend upon their situation, as it appears from the evidence.(n) As to costs, they can be in no danger, for the mortgage is retained in the decree, to the amount of the judgment, and it is agreed to have been retained properly. This is abundantly sufficient to discharge all costs. But the doctrine is settled in favor of their competency.(o) Even a guardian, *ad litem*, for the complainant, is not incompetent, though liable to costs, if they are decreed; and the reason is, because the costs are within the discretion of the Chancellor: they are, therefore, considered contingent.(p) The case of *Colton* v. *Luttrel*,(q) is directly in point. So is the case of *Man* v. *Ward*,(r) and these cases go upon the general rule, that where no decree can be had against defendants, where they are not substantial parties, there they are admissible.(s) Their interest is, in such cases, entirely contingent.

It is not questioned, that by a concurrence of accidental circumstances, we have been enabled, through a rigorous exertion of legal right, to redress previous injuries. But much labor has been exerted, to prove what we do deny, viz. that there was a pre-concert among the appellants, to effect this purpose. Yet this is equally immaterial, if our acts were legal.

But take the other view of the subject. Suppose combination material—the rule is, that the answer of one defendant is not evidence against the other. Both at law and in equity, a man is not implicated by the declarations of another, unless he is present, and either assents or does not contradict them. Another rule is, that where a fact is charged, but denied, in order to do it away, there must be ε contradiction by two witnesses; and the Court will never presume

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(n) *Piddock* v. *Brown,* 3 P. Wms. 288.

(o) *Bebee et al.* v. *The Bank of New York,* 1 John. Rep. 529, per Spencer, J., 556, and per Kent, Ch. J., 577, 8.
(p) *Lupton* v. *Lupton,* 2 John. Ch. Rep. 614.
(q) 1 Atk. 451.
(r) 2 Atk. 228.
(s) *Dummer* v. *Corporation of Chippenham,* 14 Ves 250, 1. *Whitworth* v. *Davis,* 1 Ves. & Bea. 549, 550

more from given circumstances than is necessary to account for them. Now the only charge of combination is with a view to compel an assumption of J. Neilson junior's debts. There is not a particle of pretence that this was ever an object of either of these appellants. They never expected it. They expressly an l solemnly deny this, and it must be made out by more than one witness. Where a charge in the bill is explicitly denied, the Court will not slightly reject the answer. This denial is attempted to be repelled by circum stances alone; and there is no proof whatever, of previous combination, with the view alleged, nor with any view, except at one or two insulated conversations. One was with Griffeth, before the sale, which he explains away; the other with M'Donald and others, stating confessions subsequent to the sale. Both amount to but little, and being a most suspicious kind of evidence, at best, and made without the knowledge or assent of other defendants, should never be received to countervail the solemn denials set up in the answer, by any of the defendants. As to Griffeth's declarations, admitting them to be as sworn to by Hunter, you are to presume no more than will account for them; and his intent to sell as rapidly as possible, under the direction of M'Donald, is all that can be presumed within the rule. Eddy's conduct is accounted for by the fact that he was bidding to secure a debt of his own. This is enough, independent of the other evidence, which is also strong. He offers if his debt can be paid, to advance the money, and stop M'-Donald's operations. He must be implicated, it seems, merely because he goes, bids, and buys for specie.

But suppose the whole charge of combination to be true. Even if it be illegal, can this affect a legal act? The demand of specie, and the respondent being a rich man, worth $20,000, form, it seems, the law of his case against the sale. Suppose him worth $10,000—the rule is just one half as strong: and when you come down to the poor man, it ceases to apply. But the truth is, the question, as to the demand of specie, and the manner of proceeding, was one of mere discretion in the officer, which he might exercise one way or the other, at his pleasure; and *Bray* v. ———, cited

m the opening, is a complete illustration of the rule which governs in this case. Bank bills were refused from mere pique, yet the Court denied an injunction to stop the sale of the goods distrained. A Court has just as much right to say that M'Donald shall receive bank bills, as they have to set aside this sale. If the transaction was legal, the severity of the proceeding was a case for the determination of his own conscience. There is no pretence that the act of sale was hurried. Sufficient time was taken for this purpose, and the sale was perfectly regular.

But the proceedings have been likened to an effort to prevent competition among bidders, which it is agreed should avoid a sale. That is where the Sheriff may act otherwise, without being possibly accountable. Here he might have been. The respondent's circumstances cannot control the rule. Whether his property was abundant or scanty, in either case there was a possibility of injury to the Sheriff, had he disobeyed M'Donald's directions. That the whole must have been matter of discretion is plain, from the very circumstance that the law gives no rule. What are current bank bills? Are they those on the bank of Niagara, or on the banks of New York? Is their goodness or badness matter of law? Can degrees of *perversion*, as it is called, be thus settled? No. The deputy proceeds with promptness, and obeys the plaintiffs at those very points where obedience was a duty. As to grouping the property, and whether it shall be sold in lots or separately, to which several of the cases cited on the other side relate, this is another affair, in which the discretion of the officer comes in; but this does not apply either to the demand of specie or the postponement. Why, then, is the great sacrifice of property pressed upon us? If the sale was illegal, this was enough. It should be set aside. If legal, the sacrifice was a natural consequence, which cannot be made the basis of relief. There was a regular advertisement; but had it been otherwise, the sale would have been valid.

It is said the sale was oppressive and tyrannical, a species of duress which should avoid the bond and mortgage. But

what is this oppression and tyranny ? The amount of it is, that, by legal means, M'Donald obtained these securities. Take the case of a suit commenced and driven to judgment and execution, for a debt, which leads the defendant to comply with the demands of the plaintiff, for a farther security : it is equally easy to decry all this as oppressive, abusive, tyrannical, &c. When are you to draw the line ? The law has prescribed its own rules. Property cannot be sold without a judgment, execution and advertisement. Are all the legal guides to be rejected, or confounded with mere discretion ? Eddy offered the respondent specie, to redeem the execution,(t) but the offer was declined, because a trifling premium was demanded. What extraordinary danger, then, did he stand in ? Was he so entirely in M'Donald's power as to be unable to help himself ? Suppose he had refused to borrow the money at all. He was helpless only to the amount of the premium. It is plain, from the evidence, that he obstinately refused to exercise the means within his reach. Then, after the sale is carried on for some time, with the advice of his counsel and friends, and in consideration of surrendering the sales, and giving the releases and assignment, he assumes the debt of his son, by way of advancement upon a family arrangement. This is a very ordinary advancement. It was the simple act of paying the son's debt, and taking it out of his portion. The son's consent was not necessary. The respondent had before offered to purchase these very debts, at five shillings on the pound.(u) This distinguishes it from the case of *Nicholls* v. *Nicholls*, (1 Atk. 409,) referred to by the Chancellor,(v) where there had been no previous negotiation. In the present case, the transaction was little more than the consummation of an old bargain ; and, being reasonable, should not be set aside.

It is said, on the other side, that the authorities which we cite present the case of advantages obtained legally ; and that none but Sir John Fagg's case go farther than to protect agreements thus obtained. But the cases are abundant to show that the reason of the thing is the only question in Chancery. Thus usury, duress, &c., if set up and proved as a defence, wholly avoid the instrument sought to be en

(t) See post, the statement of Eddy's case by the Ch. J.

(u) Vid. the 1st concluding point of the Ch. Justice's opinion.
(v) 6 John. Ch. Rep. 211.

forced ; but on a bill filed, the complainant is holden to do full equity before he will be relieved. So here, if there is a technical duress sufficient to avoid the securities at law, let it be done. But coming here, as complainant, the party must be judged according to the rules of equity ; and, as a condition of relief, must do what is reasonable on his part. The respondent acted under the advice of counsel. Whether this advice was right or wrong, is not the question. It is enough that his act appears to have been in the presence of, and by the aid of counsel, and therefore deliberate. In *Stapleton* v. *Stapleton*,(w) it is said, " This Court always considers the reasonableness of the agreement;" and *Pullen* v. *Ready*,(x) and *Stephens* v. *Bateman*,(y) show that though there be a mistake, or the bargain unequal, it will not be set aside, if made under the advice of counsel. In *Payne* v. *Dudley*,(z) it is said, " Courts of Equity never interfere to deprive the plaintiff at law of any legal advantage which he may have gained, unless the party seeking relief will do complete justice by paying what is really due. Indeed they have, upon the same principle, gone so far as to refuse their assistance, in relieving against a judgment, obtained by fraud." The case of *Cranstown* v. *Johnston*, cited in the opening, was decided upon this ground. Thus the Court will not look to the manner only, but the matter of the agreement, and withhold their assistance until every thing reasonable is done.

Here was a negotiation for an entire settlement, not only between the respondent and M'Donald, but between them and the son. All debts due both from the father and son are released. Now the son is no party to the bill ; and can never be concluded by the proceedings in the suit. The decree, then, presents this case : the father first negotiates the release of the son, and then goes to equity, gets relieved himself, and thus procures the discharge of both. It is no answer to so plain an absurdity, that the son is insolvent. He may be a man of property hereafter, and be compelled to pay the debt. The rule as to parties is not matter of degree, to be determined by speculation and probability. M'-Donald, alone, has a right to compute the value of the debt ;

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(w) 1 Atk. 10.
(x) 2 id. 591
(y) 1 Br. Ch. Rep. 25.

(z) 1 Wash. Rep. 196.

and if there is any thing in the rule that you will not relieve till the parties can be fully remitted to their respective rights, you will refuse relief in this instance.    You never can so modify the decree as to affect the rights of the son.    Besides, he has since been discharged under the insolvent act, by the aid of his father, who is the assignee representing the rights and liabilities of the son.    M'Donald has tl ·s lost one of his principal remedies.

But if these securities are not to stand for the whole claim, what shall they stand for?    The Chancellor correctly admits that they are good for something.    We do not urge any claim by way of set off.    We know this cannot be allowed. All we say is, that here is a legal security, which must stand for all the demands taken into contemplation by the parties to the contract, even had they been damages for an assault and battery or any other tort.    It is enough that the claims of M'Donald might have been pursued, or even that he might have attempted to pursue them against the respondent.    For these the respondent insisted upon a release, which certainly applied to the frauds practiced by the replevin, and the respondent's wrongful act in appropriating the avails of the raft.    As to the property declared for in the replevin, the right was settled by the suit at law.    For that which the respondent omitted in his declaration, he might have been pursued as a trustee in a Court of Equity.    The raft-claim stands on a still stronger ground.    Admit that the contract was executory and would not technically pass. the timber,(a) the consideration of the sale (a pre-existing debt) was paid.    That contract could have been enforced as an equitable right against both father and son, the former having full notice; and declaring that M'Donald's debt is the last which his son shall pay.    To produce still further injustice, the respondent waits till all remedy upon the raft agreement is barred by the statute of limitations before he comes for redress against these securities.    Turn him round, then, and place him upon his legal rights.

But it is said the pleadings have not set up our adverse claims.    It is entirely immaterial, whether this be so or not. When our securities are assailed by the respondent's plead-

(a) Vid. post, introduction to Ch. Justice's opinion: also, Judge Woodworth's opinion, who states the facts upon this point.

ings, we have a right to show the whole matter, in order to repel his claim, as essentially conrectrd with it. The pleadings, however, do tell the whole story. We set up the fraudulent proceedings of the respondent as the reason for demanding specie and making advantageous sales; and allege that he was morally bound to refund to M'Donald the avails of the raft and other property, &c. This is sufficient. No particular form of words is necessary. The fraud is presented in the answer as we claim to use it here, by way of repelling the demand set up in the bill.

WOODWORTH, J. The object of the bill is, to be relieved against a bond and mortgage, given by the respondent to William M'Donald, and a note of fifty dollars to Seth Eddy

The appellants are charged as parties to a fraudulent combination to oppress the respondent, by the sacrifice of his property at a Sheriff's sale, in order to indemnify themselves for certain debts against John Neilson, jun., a son of the respondent.

On the 22d Nov. 1819, the appellants and others attended the sale, when personal property to a large amount was sold by Griffeth, and purchased chiefly by M'Donald and Eddy. It is not necessary to occupy time, by a minute statement of facts. I shall merely observe, that the respondent was a man in affluent circumstances, having a large real and personal estate of from 12 to $15,000. The amount of the execution was $480 83. It appears that the respondent requested Griffeth, the officer, to delay the sale, until he could send about three miles and procure the money; Griffeth declined taking any thing but specie. The respondent then offered to pay in specie the next day, or as soon as a person could go to Waterford and return: security was offered for the performance. These propositions were rejected on the ground, that M'Donald insisted on an immediate sale, although the execution had been but a few days in the officer's hands. M'Donald, in his answer, admits the demand of specie was with the view of preventing the respondent from obtaining the means of satisfying the execu-

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

tion, with as much facility as he otherwise might have done, and with the view of making advantageous purchases, in the hope of saving a large amount due to him from John Neilson, jun. ; believing that the respondent had fraudulently combined with his son, to prevent the collection, and was morally bound to refund the avails of a raft, of which he fraudulently got possession. After selling the out door property, and when the officer was about to commence the sale of the furniture, the respondent was prevailed on by the advice of his friends, and in order to prevent a further sacrifice, to make an accommodation, by which $2500 was secured to M'Donald in satisfaction of the execution and his debt against John Neilson, jun. The property sold was then given up.

Whether the contract can be upheld.

I have thus glanced at the material facts ; the question is, can a contract, entered into under such circumstances, be upheld in a Court of Equity ? I am clearly of opinion it cannot, without overruling long established and well settled principles, hitherto considered of vital importance to protect against that species of oppression, which is sought to be justified under the forms of law. With respect to Griffeth, certain duties devolved on him as a public officer ; he was undoubtedly to take all necessary and lawful means to comply with the exigency of the writ, and thereby to secure to the plaintiff in the execution, the fruits of his recovery.

Officer to take necessary lawful means to secure debt.

But time, place, manner of sale, in his discretion.

As to time, place and manner of sale, a sound discretion was vested in him ; but in full confidence that it would not be abused. It is indispensably necessary to the due administration of justice, that the exercise of this discretion should never be under the direction of one party, so as to oppress and bring ruin on the other. The officer is bound to consult his own judgment, to act firmly, but temperately, and in no case can he, without just reprehension, lend himself to the views of either party, or become the instrument to avenge their real or imaginary wrongs.

Not to obey one party, so as to oppress the other.

Officer's conduct unjustifiable, wanton, oppressive, not excused by orders.

The conduct of the officer was altogether unjustifiable, wanton and oppressive ; it is neither palliated or excused, by proving that he acted under the orders of the plaintiff in the execution. After property, valued at $1200 and up-

wards had been sold for $300, a suspension takes place, the negotiation is concluded and the mortgage given. Did the parties treat on equal terms ? Was the respondent under no restraint ? Was he induced to compromise to save his property from further sacrifice? It seems, to me, there can be but one opinion on this subject. If so, can a lawful contract be upheld by such means ? Here was a pressure upon distress, which, in the view of a Court of Equity, entitled the respondent to relief.

The bond and mortgage must stand as a security for the amount due on the execution, with interest to the time of tender. It is scarcely necessary to cite authorities to prove, that where advantage is taken of the party's circumstances, so that he acts not voluntarily but under necessity ; where a deed is obtained by undue influence, and the process of law abused, a contract resting on such a basis cannot receive the countenance of a Court of justice. (*Nichols* v. *Nichols*, 1 Atk. 409. *Thornhill* v. *Evans*, 2 Atk. 330. 1 Mad. 243. *Gould* v. *Oxenden*, 3 Bro. P. C. 560. *Thornhill* v. *Evans*, 6 Bro. P. C. 614. *Lamplugh* v. *Lamplugh*, 1 Dick. 411.)

But it is contended by the appellants, that the mortgage ought to stand as a further security, on the ground that the respondent, after notice of M'Donald's equitable interest, fraudulently interfered and prevented his receiving the avails of the raft. The first objection to this is, that the claim for the raft is not in issue between the parties, on the pleadings in this cause. The bill is silent on this subject. The answer of M'Donald professes to state the evidence given on the trial of the suit in replevin ; and, among other things, alleges, that the defendants proved that John Neilson, jun., in 1816, sent a raft to New York worth 1000 or 1200 dollars, which he had contracted in writing to deliver to M'Donald, in part payment of the debt due to him ; that the raft had been withheld from him by the respondent, who received the avails ; and that on a trial of an action of trover against Hewit, John Neilson, jun., testified that the respondent was to pay out of the avails, certain debts, among which was a debt due to Rockwell and Stebbins. In another

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson

Securities to
stand for debt.

Advantage taken of party's circumstances, &c., a cause to set aside contract.

Whether mortgage to stand as security for avails cf raft, &c.

Not in issue

M'Donald
v.
Neilson.

part of the answer, M'Donald states, that his conduct at the sale was in the hope of saving a portion of the debt due to him from John Neilson, jun.; but it is no where averred, that the respondent in this cause was bound to account for the raft, nor is it urged as a ground of equity, that the bond and mortgage should stand as a security for the same.

It is impossible, from the scope of the answer, to make out that any such claim was relied on in this cause. The proof given on the trial at law, and the belief that the respondent had fraudulently combined, are suggested as justifiable grounds, in the opinion of M'Donald, for pursuing a rigorous course at the sale, and for believing that the respondent was morally bound to account for the raft. These facts are introduced with others, to show the motives which governed the appellant. The respondent could not consider himself called on to admit or deny this statement. It was not put in issue. The respondent has not gone into any proof respecting the raft, nor the former trial; reposing himself, as he well might do, that by the pleadings they were not drawn in question. The rule laid down in *James* v. *M'Kennon*, (6 John. 564,) is, that "every material allegation should be put in issue by the pleadings, so that the parties may be duly apprised of the essential inquiry, and may be enabled to collect testimony, and frame interrogatories in order to meet the question." So also in the case of *Stewart* v. *The Mechanics and Farmers Bank*, (19 John. 505,) it is laid down as an undeniable principle, that the decree of a Court of Equity must be founded on some matter put in issue between the parties. It is bound to decide according to the allegations and proofs, as much as a Court of law.

*Every material allegation should be put in issue.*

But admitting the claim for the raft is sufficiently alleged to call on this Court for an opinion, whether the bond and mortgage shall stand, as a further security, for whatever may appear to have been received by the respondent, I will next examine its validity. The claim is for unwarrantably interfering, so as to prevent a delivery of the lumber. Could M'Donald maintain an action at law to recover dam-

ages? I apprehend not, for he never acquired title to the property. His claim rested on an executory contract, made with John Neilson, jun. In *M'Donald* v. *Hewit*, (15 John. 349,) the Supreme Court held that the contract was executory, and did not vest the property; and therefore the plaintiff could not maintain trover for the conversion. The right of action would be against John Neilson, jun. The case appears to be this: the father interfered and caused the fund which the debtor had stipulated to be applied to M'-Donald, to be diverted and paid to other creditors. I think the conduct of the respondent was reprehensible; but the question is, has the law provided a remedy for the act? It is not included within the legal notion of fraud. I have not been able to discover any authority that establishes a liability in such a case. None was adduced on the argument. From the acquiesence of M'Donald, after the decision in the cause against Hewit, and no attempt to sustain a prosecution against the respondent, it may be inferred, that a recovery was considered hopeless.

John Neilson, jun., testifies, that although the interference of his father was without his authority, yet he afterwards approved of it, and that the respondent has paid to his creditors much more than the avails of the timber. It is true, that on the trial against Hewit, he testified that the debt of Rockwell and Stebbins was to be paid by the respondent, and on the subsequent trial, he does not prove that fact. If his testimony is impeached in this particular, the appellant has had the benefit of it in the replevin suit, in which he succeeded. The execution in favor of Rockwell and Stebbins was held to be fraudulent, and probably on the ground that the respondent had paid that execution, with money received on sale of the timber.

Is, then, this claim respecting the raft, for which M'Donald could not sustain an action either at law or in equity, as plaintiff, capable of being now resuscitated and enforced as an equity, which the respondent is bound to satisfy?

It cannot be viewed in the light of a set off. To constitute that, there must be mutual debts. (Montagu, 17.) A Court of Equity follows the same rules as a Court of Law,

To warrant set off, there must be mutual debts, between same parties in their

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

own right, of
same kind or
quality, and
clearly ascer-
tained.

A court of
equity follows
same rule as a
court of law
in this respect.

as to set off. The debts must be between the parties in their own right, and must be of the same kind or quality, and be clearly ascertained or liquidated. (*Duncan* v. *Lyon*, 3 John. Ch. 359. Ambler, 407. 3 Caines, 84. 2 John. 150, 155.) We must conclude from the evidence that the avails of the raft are not in the respondent's hands. Although M'Donald is a sufferer by the interference of the respondent, there seems to be no doubt, that the sum has been fully applied to other creditors. If it be conceded that M'Donald could have no redress, suing as a plaintiff, it certainly disposes of the claim to have the mortgage stand as a security. It would be altogether arbitrary to say, that an injury, for which there is no redress by the laws of the land, should be recognized in equity, as a condition upon which relief will be granted in a case, of itself, not admitting of doubt.

Decree as
to Eddy, erro-
neous.

. Facts relied
on to implicate
him

The decree as to Eddy is erroneous. He attended as a bidder, and had a right to purchase and retain his purchase. He cannot be affected by the conduct of the other appellants, unless there is proof of combination between them, for the purpose of sacrificing the respondent's property. The proof does not rise higher than slight suspicion, and cannot lay the foundation for a judgment or decree. I will notice the principal facts relied on to implicate him. Henry Neilson says he was impressed with an opinion, that the appellants were combined together, and acted in concert; but no reasons are given, except that Eddy was present, and one of the purchasers. John Walker says, that from the circumstance of the appellants bidding at the sale, counselling together, and the declaration of Griffeth, that he would be ruled in his conduct by M'Donald, he believed all the defendants acted in concert. Now the premises did not warrant any such conclusion. The fact is neither proved or disproved. Besides, what connection had the declarations of Griffeth with the question of combination?

Walter Broughton says he was in the store of Eddy in the evening of the day of sale—that M'Donald, Livingston and Griffeth came in—that much conversation took place, and the appellants appeared to be gratified at the result of the

sale—that he saw money, in gold, pass between M'Donald and Eddy—that Eddy checked the conversation, which the witness thought was out of kindness to his feelings; he being a connection of the respondent by marriage. It would be extremely dangerous, as well as unjust, without further explanation, to allow such acts and declarations, as evidence of combination.

If the testimony of Griffeth is admitted, it appears that the gold, which passed between him and Eddy, was a re-payment of the money bid by Eddy, and paid to the officer. My conclusion, however, from a review of the pleadings and proofs, would not be affected, if the depositions of Griffeth and Livingston are suppressed.

R. M. Livingston proves, that Eddy offered to pay the amount of the execution, in specie, if his debt of $50, against John Neilson, jun. was secured.

Eddy, in his answer, denies any concert or agreement, or that he attended the sale in pursuance of any arrangement. There is no evidence to destroy this denial, in the answer. The respondent assumed the payment of Eddy's debt, in consideration of his relinquishing his purchases at the sale. The decree, as to Eddy, should be reversed, and the bill, as to him dismissed with costs. As to the other appellants, it should be modified, by directing that the assignment executed by M'Donald to the respondent, be delivered up to be cancelled, and that, in other respects, the decree of the Chancellor be affirmed.

Bill should be dismissed as to him; And modified as to the other appellants.

SUTHERLAND, J. The merits of this case are in a very narrow compass. The bill, the answers, and the proofs, substantially concur in all the material facts; and the principles of law, which are involved in it, are among the simplest and the best established known in our Courts.

William M'Donald, in October, 1819, obtained a judgment, in the Supreme Court, against John Neilson, the respondent, for $480 83. On the 10th of November following he caused an execution, against the property of the respondent, to be issued on the judgment, and delivered to the appellant, William Griffeth, who was then one of the depu-

Statement of facts. Judgment—execution—advertisement.

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

Proceedings at
the sale.

Compromise.

ties of the Sheriff of Saratoga. It was levied on the 13th of November, upon all his personal property, consisting of cat tle, horses, hay, grain, farming utensils, and household furniture. Advertisements, in the usual form, were immediately put up, giving notice of the sale, at public vendue, on the 22d day of the same month. The respondent was in the city of New York, when the levy was made, and did not return home until the evening preceding the day of sale. He is admitted and proved to have been a man of large real and personal estate—estimated, by all the witnesses, at from 12 to 18,000 dollars.

On the day of sale, all the appellants went to the house of the respondent, and upon his being informed by Griffeth that he had come to sell his property, he requested a postponement of the sale, as he had not then the money sufficient to pay the execution : and, either at that time, or soon after the sale commenced, requested a suspension for a few hours, until he could send three miles, to the village of Stillwater, and obtain the money. This request was not only refused but he was informed that nothing would be taken in payment but specie. He then offered the most ample security, for the payment of the specie, in as short a time as it could be procured from the village of Waterford, a distance of about 13 miles. R. M. Livingston, and others who were present, joined the respondent in his solicitations for delay and offers of security; and remonstrated, in the strongest terms, against the harsh and oppressive proceedings of the appellants. Griffeth, the Deputy Sheriff, submitted himself entirely to the directions of M'Donald, who refused to suspend the sale. or to take any thing in payment but specie. The sale accordingly proceeded, and all the out door personal property of the respondent, which, at the lowest estimate, is proved to have been worth 1200 dollars, and, at the highest, 2000 dollars, was sold, and bid in by the appellants, for an aggregate amount of less than 300 dollars, leaving 200 dollars still due upon the execution.

In this stage of the proceedings, when the appellants were about entering his house, for the purpose of selling his furniture, the respondent, at the urgent solicitation of his friends,

consented to propose a compromise with M'Donald. M'-
Donald offered to stop the sale, and procure a restoration,
to the respondent of all the property that had already been
sold, if he would pay him the amount of a judgment which
he held against his son John Neilson, jun., for 1600 dollars,
and also a note of his son, for 800 dollars, endorsed by one
Jacob Boyce, together with the judgment upon which the
sale had taken place ; and the respondent finally consented
to give him his bond and mortgage, for 2500 dollars, payable
in five annual instalments ; and M'Donald accordingly res-
tored to him the property sold, discharged his judgment,
and assigned to him the securities against his son and
Boyce. John Neilson, jun., and Boyce are both proved then
to have been, and still to be insolvent.

ALBANY,
Dec. 1823.

M'Donald
v
Neilson.

Bond and
mortgage of
$2500.

R. M. Livingston states, "that he and the other friends
of the respondent, were induced to advise him to settle with
the said M'Donald, his demands against the said John Neil-
son, jun., by the circumstances, that the property already sold
out of doors, and what would probably be sold within the
house, would amount to more than M'Donald would de-
mand as a condition of abandoning the proceedings under
said execution ; and by the further circumstance, that it was
believed, *that he might not be able to regain his property,
or its value from M'Donald, if it should be carried away
by him :*" and further states, "that he believes that the res-
pondent's principal inducement to make such settlement,
was the same as actuated him and the respondent's other
friends in recommending such settlement."

Upon this simple, naked statement of facts, (excluding,
for the present, all consideration of the equitable claims
which M'Donald alleges he had against the respondent,) can
any man hesitate to say, that this sale was most oppressive-
ly conducted, for the express purpose of compelling the res-
pondent to assume the debt of his insolvent son, which he
was under no obligation, either legal or moral, to pay ? and
are not the common sense and the instinctive feelings of every
man outraged, by the allegation, that the respondent freely
and voluntarily executed the bond in question ? He was

Sale was op-
pressively con-
ducted to com-
pel respondent
to assume
debts of his
son.

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(b) Bac. Abr.
Duress.    At-
torney Gene-
ral v. Dutrie
et ux., 2 Vern
497. Proof v.
Hines,    Cas.
Temp.   Talb.
111. Gould v.
Okeden, 3 Br.
Ch. Rep. 560.
Kenrick    v.
Hudson, 6 Br.
P.   C.    614.
Nicholls    v.
Nicholls,    1
Atk.      409.
Thornhill  v.
Evans,  2  id.
330.

under a species of duress which left him no volition.(b)   He was compelled to elect between the sacrifice of his whole personal estate, and the giving of the security.  If the appellants had a right to put him to that election, he must abide by it.  But, in my judgment, there must be a lamentable defect in that system of laws which sanctions such proceedings ; and, if 1 do not much deceive myself, I shall be able to vindicate the system, which we have the honor to administer, from so serious an imputation.

The object of M'Donald, in refusing a postponement of the sale, and demanding specie in payment of the execution, and of the bids which were made, is perfectly apparent upon the face of the transaction.  It is not pretended, that any apprehension was entertained, that the property would have been removed, if the sale had been postponed, or that the security offered was not ample and unquestionable, or that the paper currency of the country was so depreciated or uncertain in value, as to render it unsafe to receive it in payment.  But the motives of M'Donald are not left to be gathered, as a matter of inference.  He has boldly avowed them in his answer.  " He admits that he did require payment in specie, at the sale, with the view of preventing the respondent from obtaining the means to satisfy the said execution, with as much facility as he might, perhaps, otherwise have done, and with the view of making advantageous purchases thereat, in the hope of thereby saving a portion of the large amount justly due him from the said John Neilson, jun., (defendant then and still believing that respondent had fraudulently combined with said John Neilson, jun., to prevent defendant from collecting the same.)"   It stands, then, admitted upon the case, that the sale was conducted in a rigorous and unusual manner, not for the purpose of obtaining satisfaction of the execution, but of obtaining payment or satisfaction of a debt against a third person.

Whether a
sale upon a fi.
fa. otherwise
legal, is affect-
ed by the ille-
gal purpose for
which it is
made.

The question then is, whether, admitting that the sale could not have been impeached, if this fact had not appeared, it is affected by the illegal purpose for which it was made; for, if the sale was, in judgment of law, fair and legal, and vested M'Donald with a title to the articles purchased by

him, then, undoubtedly, the restoring those articles to the respondent, affords a good consideration for the bond which he gave. But, in my judgment, the sa_e was fraudulent, and passed no title to any party to the fraud, in any article purchased at the auction. I shall assume, for the present, (what I think is incontestably established by the proof,) that Griffeth and Livingston, at least, perfectly understood the object of M'Donald, and lent themselves to the consummation of his purpose. It presents, then, the case of a combination or conspiracy, between the plaintiff in an execution, and the officer who is to execute it, so to conduct the proceedings under it, as to render it difficult, if not impossible, for the defendant, with the most abundant means, to pay it; and so as to prevent the possibility of competition at the sale, for the avowed purpose of producing a sacrifice of the defendant's property, and enabling the appellants to *make advantageous purchases*. Can there be a doubt, if the sale had proceeded, and no compromise had taken place, and the respondent had filed his bill for relief, that the Chancellor should have set aside the sale, as fraudulent, so far as the appellants were the purchasers, and have compelled them, upon receiving the amount of their debt, to restore the property purchased to the respondent, or if they had parted with it, to pay him its full value?

The case of *Lord Cranstown* v. *Johnston*,(c) is a direct authority to this point. In that case, Johnston, having a just debt of £2500, against Lord Cranstown, and not being able to obtain satisfaction of it in England, instituted proceedings against him in the island of St. Christophers, where he had an interest in a valuable estate. He obtained a judgment against Lord Cranstown, under which he caused his interest in the estate to be sold, and became himself the purchaser, through the medium of his agent. The proceedings were admitted to have been in strict conformity to the law of the island, and to have vested in Johnston the legal estate in the property purchased. Lord Cranstown filed his bill for relief against the sale, and prayed a re-conveyance of the estate, upon payment of the debt and cost to Johnston.

<div style="margin-left:auto">

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(c) 3 Ves. jun
170.

Case of Ld.
*Cranstown* v
*Johnston* stated.

</div>

ALBANY,
Dec. 1823.

M'Donald
v
Neilson.

He founded his claim to relief upon several grounds :

1. That when the suit was commenced, he was not personally resident in St. Christophers, was never served with process, nor appeared in the cause.

2. That when the suit was instituted, he was in treaty with the defendant, for securing the debt—that notwithstanding the treaty, the defendant directed the proceedings, to procure an absolute sale of his estate; that, while the proceedings were going on, he declared to several persons, that his only object was to obtain security for his debt, and that he would, at any time, accept principal and interest

The defendant admitted, that there had been a correspondence between him and the complainant, in relation to a settlement, but that, instead of being lulled into security by it, he had expressly informed him, that he should proceed against his St. Christophers estate—that he had informed the husband of the complainant's mother, that it was in his power to procure an absolute sale of the complainant's estate, and that he should do so, if this debt was not paid; and urged him to become the purchaser, and pay the debt. He explicitly denied having told any one that his only object was to obtain security, and that he would, at any time, accept principal and interest—that all the proceedings had been in strict conformity to the law of the island. No part of the answer was materially impeached by the proof.

The defendant's correspondence with his agent in St. Christophers constituted a part of the proofs. And from that correspondence it appeared distinctly that the defendant's object was, not to obtain payment of, or security for his debt only, but to become the absolute purchaser of the West India estate.

The master of the rolls granted the relief prayed for. He thought the law of St. Christophers, which authorized the sale of an absentee's estate without actual notice of the proceedings, merely by leaving notice at his last place of residence. and posting another upon the door of the Court house, a very unwise and improvident one. But he admitted it to be the law, and that the defendant had a right to proceed under it, and he could not grant relief upon that ground. He ex-

presses his conviction that Lord Cranstown did not believe that his estate could be absolutely sold; but admits that this circumstance could not affect the defendant. He admits that the denial of the defendant that he ever said his only object was security, and that he would, at any time, take his principal and interest, must be taken as true, being contradicted only by a single witness; and does not put his relief upon that ground. He places it expressly upon the ground that, from the correspondence between the defendant and his agent, it was apparent that the defendant's object in the sale was, not only to obtain payment of his judgment, but to make *an advantageous purchase.* His language is this; " Upon the evidence, the case is clear of all doubt as to the transaction, and the object the defendant had in view in getting that judgment.(d) From the letters of June and September from the agent, it is clear the object of the defendant was, not only to obtain a sale to satisfy his judgment, but a sale at which he was to be the purchaser, upon such beneficial terms, that it would be worth his while to forego other prospects in life, viz. the settlement referred to in the East Indies. From the letter of the 13th November, from the agent, and the defence, I am to understand, that if 5s. had been given, it would be equally competent for him to insist that that should be the price, and that he had as good a right to keep it as he has now. Such a picture of a sale under a judgment so insisted upon, is such as I should not have thought could have been exhibited in a Court of Justice with a serious intention, supposing that any law of any country should be perverted to such a purpose."(e)

Again: " It has been argued very sensibly, that it is strange for this Court to say the sale is void by the laws of the Island or for want of notice. I admit I am bound to say, that according to those laws, a creditor may do this. To that law he has had recourse, and wishes to avail himself of it. The question is, whether an English Court will permit such an use to be made of the law of that Island, or any other country. *It is sold, not to satisfy the debt, but in order to get the estate,* which the law of that country never could intend, for a price much inadequate to the real value, *and*

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(d) 3 Ves
Jun. 179.

(e) id. 180,
181.

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson

(f) Id. 182
(g) Id. 183.

to pay himself more than the debt, for which the suit was commenced, and for which only, the sale could be holden."(f)

The legality of the sale, if a third person had been the purchaser, is admitted by the master of the rolls, and that no relief could have been had against him.(g)

The act under which the sale took place was the act of 5 Geo. 2, ch. 7, which extended to all the English plantations. It was in force here from 1732, till the revolution.

The master of the rolls, I admit, lays considerable stress upon the unreasonable provision of the colonial act as to the service of process, and the mode of sale. But it is clear upon the face of the case, that striking out of it the evidence that Johnston's object in effecting the sale was, not only to obtain payment of his debt, but to purchase the estate, the relief could not and would not have been granted. It was put upon the ground, that his proceedings were a fraud upon the act, inasmuch as his object was to effect a purpose which it did not authorize or contemplate, under color of a proceeding which it did authorize. And does not this principle commend itself to all our feelings of natural justice and equity?

Legal act presumed to be done for legal purpose, unless contrary appear by positive proof or strongest circumstantial evidence.
But when it does appear, court will restrict operation to object which might legally have been accomplished.

Now can there be any difficulty in the application of this principle? A legal act will always be presumed to have been done for a legal purpose, unless the contrary is made to appear by positive proof, or the strongest circumstantial evidence. Every intendment shall be in favor of the act. But when it does appear to have been done for an illegal purpose, a Court of Equity will restrict its operation to the object which might legally have been accomplished by it.

The law is full of analogies in support of this principle. Upon what other ground is an action upon the case sustainable against a Sheriff for oppressively and maliciously executing process? The oppression and the malice in many, if not in most cases, consist in the motive with which an act, legal in itself, is done. Take the case of *Rogers* v. *Brewster*, (5 John. Rep. 125, and the cases there cited.) The process of the constable authorized him to take the horse of the plaintiff, as much as any other article of personal property. But the circumstances of the case showed that his motive in taking

the horse in preference to any other property, was, not to obtain payment of his execution in the most speedy and effectual manner, but to vex and oppress the plaintiff.

I shall not take up the time of the Court, in showing that the only legal purpose for which the execution in this case could be used, was to obtain satisfaction of the judgment upon which it was issued; nor in a recapitulation of the evidence to show, that, instead of being used for the purpose, it was used for the avowed and express purpose of enabling M'Donald to purchase the respondent's property at enormous and ruinous sacrifices; and if I have been successful in showing that the law would not have permitted him to have retained the property, but would have compelled him to restore it, or account for its value to the respondent; it necessarily follows, that the voluntary restoration of that which the law would thus have compelled him to restore, can form no consideration for the bond of the respondent.

But it may be said, that if Eddy should not be held to have been a party to the combination then the purchases made by him were legal, and the restoration of the property formed a portion of the consideration of the bond. The consideration for Eddy's portion was the respondent's note. It did not go into the bond; and if it had, M'Donald could not avail himself of it. The judgment and note of John Neilson, jun., and Boyce, who were both notoriously insolvent, it will not be pretended, formed a consideration sufficient to sustain the bond; and these are the only legal considerations beyond the debt due from the respondent, for which it is pretended the bond was given.

In this view of the case, therefore, I should be clearly of opinion, that the respondent's bond ought to stand as security only for the amount of M'Donald's judgment; and that upon payment of that, it ought to be given up and cancelled.

Nor have I been able to satisfy myself, that M'Donald has any equitable claim upon the respondent, for which the bond ought to stand as further security. If it were apparent upon the case, that the bond gave M'Donald no more than he was equitably entitled to from the respondent, the

---

**Margin notes:**

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

Object of execution to satisfy debt.

Voluntary restoration of what law will restore no consideration.

Restoration by Eddy, no part of consideration.

Bond, &c. should stand for replevin judgment only

M'D. has no equitable claim. If he had, security should stand for it

ALBANY,
Dec. 1823.

M'Donald
v.
Neilson.

(h) 9 Mod.
412. 1 Cas.
Ch. 97. *Proof
v. Hines,* Cas.
Temp. Talb.
111. *Gould* v.
*Okeden,* 3 Br.
Ch. Cas. 560.
*Kenrick* v.
*Hudson,* 6 Br
P. C. 614.
*Thornhill* v.
*Evans,* 2 Atk.
330. *Ld.
Cranstown* v.
*Johnston,* 3
Ves. jun. 170.

Court would undoubtedly direct it to stand, although it might have been improperly obtained ; upon the familiar principle, that he who asks for equity shall do equity.(*h*)    But then the appellant's equity ought to be perfectly clear and manifest, to induce the Court to impose terms upon the respondent, in a case circumstanced like this.

I shall not enter into a minute examination of the alleged grounds of the appellant, M'Donald's, equitable claims against the respondent.    They relate to a raft of timber belonging to the son of the respondent, out of the proceeds of which M'Donald alleges he was to have received a portion of his debt against the son, and of which he was deprived through the agency of the respondent; and to a replevin suit, for certain goods and chattels belonging to the son, of which it is alleged the respondent had become fraudulently possessed, and a portion of which still remained in his hands. It is sufficient to say, in relation to these claims, that whatever may be the rights of M'Donald, he can assert those rights either at law or in equity ; and that they are by no means so clear as to entitle him to call upon the Court in this summary and collateral manner to adjust and allow them.

The agreement of son that father shall deduct from his portion, no consideration.

Nor does the arrangement which is alleged to have been made between the respondent and his son, and sanctioned by the family, that the amount agreed to be paid by the father for the son, should be deducted from his inheritance, vary the case.    The agreement of the son formed no consideration for that of the father.    It was in his power to have deducted it without the consent of his son.    He was under no moral or legal obligation to pay the debt, and the agreement to do this was most clearly not voluntary, but extorted from him.

Evidence not sufficient to charge Eddy;

I do not think the evidence sufficient to charge Eddy as a party to the combination.    The principal circumstance which gives rise to suspicion against him, is the fact of his attending the sale prepared to pay his bids with specie. This certainly affords some reason for believing that he must have previously known that specie would be required in payment, and have been a party to the whole arrange-

ment; but it is not of sufficient weight to overbalance the positive denial in his answer.

As to the other appellants, the evidence of combination is overwhelming. The testimony of Hunter, as to the declaration of Griffeth, that he was afraid the respondent would return before the day of sale, and get the proceedings stayed, receives strong and ample confirmation from Griffeth's whole subsequent conduct, and from all the circumstances in the case. It is the first glimmering we discover of the spirit and object with which the proceedings were conducted; and makes him an accessory before the fact, to all the subsequent acts of violence and oppression. It is followed up by an abandonment of all official discretion; and an entire submission to the plaintiffs in the execution. Instead of acting as the minister of the law, and guarding its precess against misapplication and abuse, he became the passive instrument of a party in the accomplishment of his illegal purposes. It was contended upon the argument, that he was not bound to incur the hazard of a suspension or adjournment of the sale, and that the law will not inquire into the extent of the hazard. Is it indeed true, that the law will not exercise a supervision or control over the discretionary acts of its ministerial officers? That they are omnipotent and irresponsible in the exercise of the power entrusted to them? "It is a proposition," as was once said by Ld. Hardwicke, "too monstrous to be debated."

*But strong to show combination among others.*

The law will make the most liberal intendment in favor of its ministerial officers, when acting within the limits of their authority; but it will not permit them to resort to the *ultima ratio,* when the legitimate object, which it is their duty to effect, can be accomplished by milder means. Has a Sheriff a right to load an unresisting debtor, who quietly submits to his authority, with bonds and fetters, to guard against an escape in carrying him from his home to a prison? and yet it is the most effectual way of preventing an escape.

*Law intends in favor of its ministerial officers; but they should use mildest means.*

It was the duty of Griffeth, under the circumstances of this case to have suspended or adjourned the sale; and his conduct throughout the whole of this transaction, deserves the severest reprehension.

*Sheriff should adjourn sale under ft. fa. to prevent great sacrifices.*

M'Donald
v.
Neilson.

It is due to the appellant, M'Donald, to say, what is apparent on the face of this case, that he entertained a sincere and strong conviction, that the respondent had aided his son in defrauding him out of a large and just demand; and tho' this belief, unsupported as it is by proof, does not alter the legal, it does most essentially change the moral character of his conduct.

Livingston and Griffith competent witnesses.

The only question that remains, is as to the competency of Livingston and Griffeth, as witnesses. No relief is prayed against them. Whether a decree can pass against them, for costs only, seems to be questionable. But, admitting that it may, it is still but a contingent liability. A certain liability for costs is undoubtedly an interest which will render a witness incompetent. But, upon the authority of *Man v. Ward*, (2 Atk. 228 ;) *Cotton v· Luttrell*, (1 Atk. 451 ;) and *Beebe v. The Bank of New York*, (1 John. Rep. 556;) I think these witnesses were competent, and that the objection went merely to their credibility.

The decree should be affirmed as to M'Donald, but modified.

I am accordingly of opinion, upon the whole case, that the decree of the Chancellor, as it respects the appellant M'Donald, ought to be affirmed, with this modification : that the respondent, in addition to the note and judgment, which he is directed to re-assign and deliver to M'Donald, also deliver to him the instrument by which that note and that judgment were assigned to him, the respondent, by M'Donald ; to the intent that the general release which it contains, on the part of M'Donald, of all demands against the respondent, may be cancelled : and that so much of his Honor the Chancellor's decree, as relates to the appellant, Seth Eddy, be reversed.

And decree as to Eddy reversed.

HUNTER, KING, LEFFERTS, LYNDE, MALLORY, OGDEN, STRANAHAN, SUDAM and THORN, Senators, concurred.

The principal facts stated, upon which the appellants claimed that the decree of the court of chancery should be reversed.

SAVAGE, Ch. J. The facts, in this case, which appear to me, material, are as follows : In the month of September, 1815, M'Donald sold goods to the respondent's son, John Neilson, jun., amounting to $2100. On the 10th March, 1816, J. Neilson, jun., gave a note for $711 25, and on the 14th of the same month another note of $1393 82, both pay-

able to Jacob Boyce, or order, in 90 days, and endorsed by Boyce to M'Donald. On the 16th of the same month, J. Neilson, jun., and M'Donald, entered into a written contract by which it was stated that M'Donald had bought 250 sticks of timber, (afterwards estimated at $800, but which really produced but $600,) to be delivered by J. Neilson, jun., in New York, and then paid for, at the New York prices, by being endorsed on M'Donald's notes—the balance to be refunded to J. Neilson, jun., if the notes were thus overpaid. The timber was sent to New York, by one Samuel Hewitt, who proceeded to that place in company with the respondent. When the timber arrived at New York, M'Donald demanded it, but the respondent told Hewitt he had no right to deliver it. The respondent did not promise to indemnify Hewitt against the consequences of non-delivery, but Hewitt understood him that he (H.) should not be injured. The respondent said M'Donald's debt should be the last his (the respondent's) son should pay. Hewitt refused to deliver the timber, and M'Donald sued him for it. Hewitt gave himself no concern about the suit—the respondent defended it, and M'Donald failed in his action, on the ground that the contract between him and J. Neilson, jun., was executory, and did not transfer to M'Donald the title in the timber.

M'Donald sued J. Neilson, jun., on the large note, and obtained a judgment, which was docketed May 15th, 1818, and on the 19th of June following, a *fi. fa.* thereon was levied upon the personal property of J. Neilson, jun., in his possession, nearly all of which the respondent appeared and claimed, saying he had purchased it at a Sheriff's sale, upon an execution in favor of Rockwell & Stebbins. The Deputy Sheriff who levied, Franklin Livingston, one of the appellants, advertised the property for sale on the 8th of July, 1818, on which day the respondent brought *replevin* against M'Donald and Livingston, for a part of the goods, worth about $601. The value of those included in the declaration in replevin was only $365 31. On the trial, a verdict passed for the defendants in the suit, M'Donald & Livingston, on the ground that the purchase by the respondent, under the

Rockwell & Stebbins execution, was fraudulent, inasmuch as the respondent had agreed with his son to pay that execution out of the avails of the raft. On this trial, it also appeared that the respondent had no previous authority to intermeddle in the disposition of the raft, though his son afterwards approved of his acts.

A judgment was entered upon this verdict and an execution issued for $480 83, under which Griffeth, as Deputy Sheriff, advertised the respondent's personal property for . sale on the 22d Nov. 1819, at 9 A. M. [*Here the* CH. JUSTICE *adverted to the proceedings preparatory to, and attending* the sale, as above stated by SUTHERLAND *and* WOODWORTH, Js.]

The sale was proceeding, when the respondent, by the advice of his friends, proposed to compromise with the plaintiff, who offered to take $2500, in discharge of all his claims against both father and son. This proposal was finally acceded to, and the amount was secured by the bond and mortgage, in qeustion, after consultation with his family and friends, among whom an arrangement was made by which the sum secured was to be deducted out of the share which J. Nelson., jun., was to receive from the respondent's property, as a son's portion.

M'Donald, on receiving the bond and mortgage, joined with Livingston in releasing the judgment and execution obtained in the replevin suit. He transferred to the respondent the notes of $711 25, against J. Neilson, jun., endorsed by Boyce, and assigned his judgment against J. Neilson, jun., and executed a general release of all demands against both the Neilsons. The bond and mortgage were payable in five equal annual instalments, with interest.

When the first instalment became due M'Donald brought a suit upon the bond; and then, and not till then, the respondent filed his bill in the Court of Chancery for relief.

In the meantime, J. Neilson, jun., had obtained the discharge of his person under the insolvent act.

There are some other circumstances, which I shall notice hereafter.

The question first in order, relates to the competency of two of the defendants in the Court below, (Griffeth and Livingston,) as witnesses.

On the point, whether a defendant, who is charged with fraud, but against whom nothing specific is prayed, may be examined as a witness for his co defendants, the decisions in the English Courts are certainly somewhat contradictory; but it seems to me that the weight of the later authorities is in favor of their admissibility. (1 Phil. Ev. 2d Am. ed. 63. *Fenton* v. *Hughes*, 7 Ves. 287. *Dunham* v. *Corporation of Chippenham*, 14 Ves. 251. *Whitworth* v. *Davis*, 1 Ves. & Bea. 548, 551.) The inclination, in our Courts, has been " to confine the question of interest within strict and precise boundaries, and to let objections go more to the credit than to the competency of witnesses," (*Bebee et al.* v. *Bank of New York*, 1 John. Rep. 577,) and to admit the testimony of such defendants, permitting all objections to be made to their credibility rather than their competency. (*Kirk* v. *Hodgson et al.*, 1 John. Ch. Rep. 550.)

*A defendant charged with fraud, but against whom no particular relief is prayed, may be a witness.*

*Objection goes to credit.*

In my judgment, the Chancellor decided correctly in receiving the testimony of Griffeth and Livingston.

*G. & L. good witnesses.*

The other points, which appear to deserve consideration, are, 1. The regularity of the proceedings under the execution. 2. The validity of the bond and mortgage. 3. If the proceedings were irregular, whether the relief decreed by the Chancellor should be granted, under the circumstances of this case.

*Other questions.*

1. The Sheriff must obey his writ. It is his duty, therefore, on a *fi. fa.* to collect the money by the return day. He must not show favor, or give unreasonable delay, neither should he be guilty of oppression, or use more severity than is necessary. (Bac. Abr. Sheriff, (*N.*) Dalt. Sheriff, 109, 110.)

*Sheriff must obey fi. fa. and collect money by return day; not show favor or be more severe than necessary.*

In this case, the execution was delivered to him on the 10th November, 1819, returnable at the next January term. He levied on the 13th Nov. and advertised the property for sale on the 22d. The respondent was absent when the levy was made, and returned the evening before the sale. On the morning of the 22d, he requested a postponement of the

*When fi. fa. delivered, and how executed.*

sale, to which Griffeth answ red, he should obey the instruc-
tions of M'Donald.   He req.rested M'Donald to agree to the
postponement, which he refused.   I incline to credit this
statement of facts, rather than the relation of J. Neilson, jun.
M'Donald told the deputy that he should demand specie of
the Sheriff, and the deputy then gave notice that he should
require it from the purchasers.

It is not at all surprising that M'Donald should have been
willing to distress the respondent.   Smarting under the
losses, disappointments, and perplexities he had suffered, re-
sulting, as he supposed, from the wanton and malicious
officiousness of the respondent, he, no doubt, felt gratified
with the prospect of receiving remuneration and inflicting
punishment upon him.   The Sheriff, however, ought not to
lend himself to any one, and thus become the instrument of
gratifying the vindictive feelings of an exasperated party.   I
am rather inclined to believe, that, in this instance, the de-
puty acted under an impression that he was bound to obey
M'Donald's instructions.   In this he was mistaken.   He
was bound to exercise a proper discretion, and when he saw
that there must be a great sacrifice of the respondent's pro-
perty, it was his duty to have postponed the sale.   (*Tinkom*
v. *Purdy*, 5 John. Rep. 345.)   A reasonable time should
have been given the respondent to obtain the money, parti-
cularly when the Sheriff could not possibly sustain any loss
from the indulgence.

I cannot, however, believe that there was that combina-
tion or concert between the appellants, which is supposed.
M'Donald and Livingston were parties to the execution, and
it would have been strange if there had not been concert be-
tween them.   Griffeth had, several days before, informed a
son of the respondent that he should not postpone the sale
without M'Donald's direction.   He told Hunter that he in-
tended to sell as soon as the law would permit; and was
afraid the respondent would return and pay the money.   This
conversation was voluntarily on the part of Griffeth, and cer
tainly not calculated to further M'Donald's views.   The
natural consequence of making a public disclosure of what
M'Donald must have wished to be kept secret, would be to

Sheriff not to
obey party if
it will produce
a great sacri-
fice ;   should
postpone sale
where plaintiff
cannot sustain
injury by de-
lay.

No combi-
nation.

Evidence on
this point.

defeat the object, by giving the opposite party notice, and, therefore, enabling him to guard against it, by preparing to pay the money.

ALBANY.
Dec. 1823.

M'Donald
v.
Neilson.

The principal circumstance relied on to prove combination on the part of Eddy is, his going to the sale with specie in his pocket, and offering to lend it to the respondent on condition of his securing to him 50 dollars due to him from J. Neilson, junior. This fact, to my mind, is conclusive evidence of Eddy's innocence. He went to the sale with the expectation of making advantageous bargains, to indemnify himself for a loss sustained, as he alleges, through the respondent's instrumentality. What inducement can any man have to attend a Sheriff's sale, or an auction, but to make advantageous purchases? What more natural than a desire to secure a bad debt, under such circumstances? The only feature about Eddy's conduct, which seems extraordinary is, that he was willing to loan the specie to the respondent on any terms; and it can only be accounted for on the supposition that he was fearful he might not otherwise attain his object. Had the respondent accepted his offer, M'Donald's views would have been entirely defeated; and yet this offer is urged as proof of Eddy's combination!

*Eddy offered to loan specie for $50.*

In conducting the sale, the deputy seems to have acted with ordinary indulgence and prudence, but he certainly erred in refusing the postponement: And were this the only question in the cause, I should certainly not hesitate in saying that the sale should be set aside.

*Deputy erred in refusing to postpone.*

2. The sale being considered irregular, it would seem to follow that the bond and mortgage, being a consequence of the sale, must be considered as improperly obtained, and be set aside either totally or partially. In this case, however, there are considerations which have brought my mind to a different conclusion.

The opinion of his Honor, the Chancellor, on this point, is in accordance with former decisions; which are, that, although the security may have been unduly obtained, yet it shall stand for what was truly due at the time. I can see no reason for limiting this doctrine to such claims as are *legally* due. Why do parties go into Chancery but for ob-

*Though security may have been unduly obtained, yet it shall stand for what is legally or equitably due at the time.*

M'Donald
v.
Neilson.

taining what a Court of law cannot give them? The se-
curity ought to stand for what in equity and good conscience
the party is entitled to receive. "Courts of Equity never
interfere to deprive the plaintiff at law of any legal advan-
tage which he may have gained, un ess the party seeking re-
lief will do complete justice, by paying what is really due.
Indeed, they have (upon the same principle) gone so far as
to refuse their assistance in relieving against a judgment ob-
tained by fraud." (*Payne* v. *Dudley*, 1 Wash. Rep. 199.
*Small* v. *Brackley*, 2 Vern. 602.)

Respondent's
frauds.

The respondent in this case, had, by his improper and
wanton interference with the raft which M'Donald had pur-
chased and paid for, occasioned a loss to him of from 600
to 800 dollars, besides all the costs and expenses which he
sustained.

He had again, by a fraudulent purchase of the property
of John Neilson, jun., taken out of the possession of M'Don-
ald, property worth, at least, 600 dollars, a part of which,
only was included in the replevin suit. It appears, also,
that a negotiation had previously been on foot, between the
respondent and M'Donald, for the sale and purchase of the
demands which the latter held against J. Neilson, jun.; and

Offer to com-
promise, ad-
vised     by
friends   and
counsel.

it also appears, that the offer to compromise at the sale, pro-
ceeded from the respondent, was entered into by the advice
of friends and counsel, and under a full knowledge of his
rights. (1 Mad. Ch. 215.) It is said, indeed, that he was
apprehensive, from M'Donald's circumstances, that the pro-
perty, if taken away, would not be obtained again; but
surely there was no ground to apprehend that both the
Sheriff and his deputy were insolvent. He had his re-
medy against the officer, as well as against the party.
Although I cannot approve the conduct of M'Donald or
the deputy, yet it is not to be denied, that the respondent
had provoked the treatment he received. He had delibe-
rately executed the bond and mortgage, under the circum-

Family ar-
rangement

stances just mentioned, and also had, by a family arrange-
ment, placed the amount to the debit of his son, the origi-
nal debtor.

In the research which I have been able to make, I find
no case which goes the length of setting aside a convey-

ance made under such circumstances. If done at all, it should be on completely indemnifying M'Donald, for the value of the raft, the goods replevied, and a liberal allowance for the costs and expenses of a three year's litigation.

3. This brings me to the consideration of the relief, if any, which should be granted.

There is no doubt that the Court of Chancery has power to grant relief against deeds and judgments, not only when obtained by fraud or imposition, (*Reigal* v. *Wood*, 1 John. Ch. Rep. 406, and cases there cited,) but also when regularly obtained, if there are circumstances of extraordinary hardship, or great inadequacy of consideration. (*Ld. Cranstown* v. *Johnston*, 3 Ves. Jun. 170.) The party asking equity must, however, do equity. He must come into Court with clean hands, unspotted with the foul stains of fraud and chicanery. In the present instance, the respondent came with an ill grace into a Court of Equity, to ask redress against grievances which were the consequences of his own misconduct. Besides, he slept upon his rights (if any he had) until his son, the original debtor, had obtained a discharge, exempting his person from imprisonment. He had before got possession of all his son's property; and the only remedy which M'Donald had to enforce collection of what is admitted to be an honest debt, is now taken away from him. If the bond and mortgage should be cancelled at all on any terms, it should only be done partially, allowing so much to remain as would be equal to the equitable claims of M'Donald; and also upon restoring him to all the rights which he possessed anterior to the execution of those securities. The latter condition cannot now be complied with. The release to J. Neilson, jun. cannot be cancelled without instituting proceedings against him; neither can his exemption from imprisonment be taken from him.

On the whole, therefore, I am of opinion, that the bond and mortgage given by the defendant, should not be cancelled. Although the conduct of M'Donald and the deputy cannot be justified, yet as between the parties in interest, there was a sufficient consideration.

1. Demands assigned;

2. Respondent released.

3. Son released.

4. Securities executed to settle legal controversy, with knowledge of rights, and advice, &c.

5. Arrangement reasonable

1. Demands were assigned to the respondent amounting nominally, to more than the bond and mortgage : demands which he had previously proposed to purchase, at five shillings on the pound. He now gave less than twenty shillings.

2. He was released from all liability to M'Donald, which, upon equitable grounds, amounted to from fourteen to sixteen hundred dollars, besides costs and expenses.

3. The respondent's son was released from a debt admitted to be honestly due, amounting to considerable more than the amount of the bond and mortgage.

4. The securities were executed to settle a legal controversy. The respondent knew his rights, and that he had a remedy against responsible persons. He had the benefit of counsel, and the advice of his family and friends.

5. And under all circumstances, the arrangement was reasonable in itself.

My opinion, therefore, is, that the decree of his Honor, the Chancellor, be reversed.

BOWKER, BOWNE, BRONSON, BURT, CLARK, CRAMER, DUDLEY, EARLL, EASON, GREEN, HATHAWAY, M'INTYRE, REDFIELD. WHEELER, and WOOSTER, *Senators*, concurred.

A majority of the Court being for a reversal, it was thereupon ORDERED, ADJUDGED and DECREED, that the decree of the Court of Chancery, made in this cause, be reversed ; that the respondent's bill be dismissed, without costs to either party, as against the other ; and that the injunction, issued in this cause, be dissolved ; and that the record and proceedings be remitted, &c.